**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOSEPH MITCHELL CRAINE,

     Petitioner,

v.

NATIONAL SCIENCE FOUNDATION,

     Respondent,

and

KANSAS STATE UNIVERSITY,

     Intervenor - Respondent.

No. 16-9536
(National No. I14040010)
(National Science Foundation)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

Dr. Joseph Mitchell Craine petitions for review of a decision issued by the

National Science Foundation (NSF) under the National Defense Authorization Act's

Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure

of Certain Information ("Pilot Program"), 41 U.S.C. § 4712. The Pilot Program

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

protects employees of government contractors and grantees from reprisal for making certain types of disclosures. NSF determined the disclosures made by Dr. Craine, a former employee of Kansas State University (KSU), did not fall within the Pilot Program's whistleblower protections. Proceeding pro se, Dr. Craine now challenges NSF's decision. We have jurisdiction under 41 U.S.C. § 4712(c)(5) and deny the petition for review.

I

The Pilot Program prohibits government contractors and grantees from subjecting their employees to reprisal for disclosing gross mismanagement, waste, and other harms or wrongdoing relating to federal contracts or grants. The statute provides:

> An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1). The persons or bodies to whom a protected disclosure must be made are:

> (A) A Member of Congress or a representative of a committee of Congress.
>
> (B) An Inspector General.
>
> (C) The Government Accountability Office.

2

(D) A Federal employee responsible for contract or grant oversight or management at the relevant agency.

(E) An authorized official of the Department of Justice or other law enforcement agency.

(F) A court or grand jury.

(G) A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

*Id.* § 4712(a)(2).

Upon receipt of a complaint by a person who believes he has been subjected to a prohibited reprisal, the Inspector General of the executive agency involved "shall investigate the complaint and, upon completion of such investigation, submit a report of the findings of the investigation to the person, the contractor or grantee concerned, and the head of the agency." *Id.* § 4712(b)(1). Within thirty days of receiving the Inspector General's report, the agency head must "determine whether there is sufficient basis to conclude that the contractor or grantee . . . has subjected the complainant to a reprisal prohibited by subsection (a) and shall either issue an order denying relief" or remedy the reprisal. *Id.* § 4712(c)(1). The controlling burdens of proof are set forth at 5 U.S.C. § 1221(e). 41 U.S.C. § 4712(c)(6). These burdens require an employee to show that a protected disclosure contributed to the adverse personnel action. 5 U.S.C. § 1221(e)(1). Even if the employee meets that burden, the employer need not take any corrective action if it presents "clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(2).

3

II

Dr. Craine was a Research Assistant Professor in KSU's Division of Biology. In 2012, he attended a graduate student's presentation on the growth of plant species at a Long-Term Ecological Research (LTER) site, known as the Konza Prairie. The site is funded by grants from NSF. The student's preliminary analysis found that one type of plant species experienced an abrupt, non-linear growth jump in one year. At the end of the presentation, Dr. Craine questioned whether the growth jump might be explained by "observer bias," or a change in the researchers at the LTER site, R. at 754. The student, Zak Ratajczak, apparently denied that his findings were skewed by observer bias, but he incorrectly assumed that just one researcher had monitored the plant growth throughout the research period. After the presentation, Dr. Craine confronted the student's supervisor, Dr. Jesse Nippert, who refused to talk with Dr. Craine because he believed Dr. Craine was denigrating his student. Eventually, Mr. Ratajczak, Dr. Nippert, and another colleague submitted a manuscript of their findings to an academic journal, *Ecology*, for publication.

On October 19, 2013, while the manuscript was under prepublication review, Dr. Craine sent an e-mail to *Ecology*'s editor in chief, Dr. Donald Strong, accusing the paper's authors of fraud:

Hi Don,

If you are considering a paper by Ratajczak et al. regarding woody species at Konza, you might want to reconsider it.

It pains me to say this, but I think the paper is fraudulent.

4

I think you can understand that it would be better for me to address this discretely [sic] during the review process. I would prefer not to force a retraction publicly.

If this paper is not currently within Ecology, I apologize. If I can provide more information, please let me know.

--Joe

*Id.* at 807.

In response, another editor at *Ecology*, Dr. Debra Peters, asked Dr. Craine to review the manuscript. The same day, Dr. Craine wrote back:

Recommendation:   Reject (not worthy of publication)

. . . .

The authors write[,] "Since 1996, the data collection has been performed by one individual with extensive knowledge of the local flora (e.g. Towne 2002, Craine et al. 2012), ensuring that changes in shrub cover were not related to change in observer . . . [.]"

This is false.

. . . .

If you correct for observer bias, there is little if any abrupt transition in woody species cover. No abrupt transition, . . . [j]ust a smooth, steady increase in woody cover.

I used the word "fraudulent" in my initial email—and take my word for it, I don't like to—because this paper at the very least represents deliberate ignorance. . . . [S]ince being alerted, there has been no effort by the authors to correct for this.

*Id.* at 812-13.

Dr. Peters responded that she was "not concerned about observers changing through time." *Id.* at 834. Nevertheless, after learning of Dr. Craine's allegations,

5

Dr. Nippert and Mr. Ratajczak reanalyzed their data but found no impact on their conclusions. Thus, they corrected their appendices to accurately reflect the number of observers and on February 19, 2014, resubmitted their manuscript to *Ecology*.

On February 28, Dr. Craine again e-mailed Dr. Strong at *Ecology*, stating, "I'd like to see the appendices in order to know whether the authors are still making false statements." *Id.* at 836. He suggested that the authors had lied in their manuscript, that others in the program had committed misconduct, and that he might reach out to NSF's Office of Inspector General (OIG):

> [T]he issue is rooted deep enough in the LTER (observer data has been taken off-line, the [Principal Investigator] of the LTER accused one of their staff (not me) of providing the anonymous review on the paper and then threatening them against ever doing so) that I may need to involve NSF OIG.

*Id.* In reply, Dr. Strong wrote, "Joe: Ask the authors. Regards, Don." *Id.*

News of Dr. Craine's allegations soon reached Dr. John Blair, the Principal Investigator at the LTER site, whom Dr. Craine had accused of misconduct in his earlier e-mail. On March 27, not knowing that Dr. Craine had threatened to involve OIG, *id.* at 821, Dr. Blair e-mailed Dr. Craine to request a meeting to discuss his accusations as well as KSU's policy on making allegations of academic misconduct. Dr. Blair wrote:

> [Y]ou have now raised serious allegations of scientific misconduct involving . . . LTER scientists and LTER data (re[:] knowingly misrepresenting or misinterpreting LTER data in peer-reviewed publications). This was apparently done without actually discussing your concerns with the scientists involved. Further, it appears that you implied in correspondence with the [editors at *Ecology*] that I tried to "cover-up" this alleged misconduct by threatening an LTER staff

6

member and by removing LTER data from our on-line database. Those allegations are patently false. Accusing a scientist of this kind of misconduct is serious business, and will not be taken lightly. I quote from the University Handbook, Appendix O: Policy on Integrity in Research and Scholarly Activity[:] "It should be emphasized that reporting misconduct in scholarly work is a responsibility shared by everyone at the University. However, frivolous, mischievous, or malicious misrepresentation in alleging misconduct cannot be tolerated. Misconduct in scholarly work may take many forms, but it does not include honest error or honest differences in interpretations or judgments of data."

*Id.* at 838. In preparing for this meeting, Dr. Blair discovered on March 31, 2014 that Dr. Craine threatened to involve OIG. *Id.* at 822.

On April 7, 2014, Dr. Blair and several KSU officials met with Dr. Craine. Dr. Craine failed to justify his accusations. But later that day, Dr. Craine e-mailed OIG. According to the OIG intake memo, Dr. Craine claimed he was being subjected to reprisal "for alerting an editor of a journal that a manuscript he reviewed contained a false statement." *Id.* at 2. As he had done before, Dr. Craine specifically identified this erroneous statement in the manuscript regarding the number of observers: "Since 1996, the data collection has been performed by one individual with extensive knowledge of the local flora (e.g. Towne 2002, Craine et al. 2012), ensuring that changes in shrub cover were not related to change in observer . . . [.]" *Id.* at 3 (internal quotation marks omitted). He also claimed he was facing reprisal for supposedly breaching KSU's "policy and procedure in reporting the alleged false statement to university officials first." *Id.* at 2.

On April 14, 2014, the director of KSU's biology division, Dr. Brian Spooner, notified Dr. Craine that he was initiating an action against him under the University

7

Handbook, Appendix O. He based this action on Dr. Craine's having made unsubstantiated allegations of fraud and misconduct without first presenting his concerns to the persons involved or university officials as required by Appendix O. Dr. Spooner advised that the action would encompass whether the manuscript authors had indeed committed academic misconduct and whether Dr. Craine engaged in frivolous, mischievous, or malicious conduct by alleging fraud and misconduct.

A KSU Inquiry Team composed of university professors investigated and found no academic misconduct by the manuscript's authors. In addition, the Inquiry Team determined that Dr. Craine had maliciously misrepresented that the manuscript was fraudulent and frivolously misrepresented that Dr. Blair had engaged in misconduct. For this, the Inquiry Team recommended that Dr. Craine be terminated from employment. On September 8, 2014, KSU's Provost, Dr. April Mason, met with Dr. Craine to afford him "a full opportunity to dispute the Inquiry Team's findings and conclusions." R. at 897. She allowed him to present his side of the matter but later concurred with the Inquiry Team's conclusion. She terminated Dr. Craine's employment effective October 24, 2014. Dr. Craine contested his firing before a KSU Grievance Panel composed of different professors, but after two days of open hearings, the panel unanimously upheld Provost Mason's decision.

Meanwhile, OIG also investigated. During an interview with an OIG lawyer, Dr. Craine acknowledged that he had not reported a violation of a rule, regulation, or condition tied to NSF's funding of the LTER site. Instead, Dr. Craine said, he had complained about a false statement of "a scientific issue." *Id.* at 175. The OIG

8

report did not conclude whether Dr. Craine was subjected to a prohibited reprisal. But the report did note that his termination centered on his violation of Appendix O, for failure to "report his concerns to his department head, dean, or provost prior to going to the Journal." *Id.* at 50. Further, the report concluded that Dr. Craine had presented "no direct evidence that the Inquiry Team or Provost acted with a retaliatory motive." *Id.* at 52.

Later NSF issued a summary ruling concluding that Dr. Craine's e-mails to the *Ecology* editor were not protected disclosures under the Pilot Program, and even if they had been, NSF found insufficient evidence that Dr. Craine had been subjected to a prohibited reprisal. Dr. Craine appealed, and we remanded to NSF because its summary ruling was inadequate to permit judicial review. *See Craine v. Nat'l Sci. Found.*, 647 F. App'x 871, 872 (10th Cir. 2016) (unpublished). NSF issued a detailed amended decision denying relief, and Dr. Craine now seeks review.

III

We review NSF's decision under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 701-06. *See* 41 U.S.C. § 4712(c)(5). "Under the APA, a 'reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A) (ellipses omitted). "This standard requires us to determine whether the agency considered the relevant data and rationally explained its

9

decision." *WildEarth Guardians v. EPA*, 770 F.3d 919, 927 (10th Cir. 2014). We will not disturb the agency's action unless it

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quotation omitted). In conducting our review, "we accord agency action a presumption of validity [and put the burden] on the petitioner to demonstrate that the action is arbitrary and capricious." *Copar Pumice*, 603 F.3d at 793.

NSF gave four reasons why Dr. Craine's allegations of fraud and misconduct sent to the *Ecology* editor did not fall within the Pilot Program's protection: (1) the editor is not an enumerated person or body under the statute; (2) Dr. Craine's allegations did not qualify as protected disclosures; (3) Dr. Craine did not reasonably believe his allegations related to the subject matter of the statute; and (4) Dr. Craine was not subjected to a prohibited reprisal. We next examine Dr. Craine's challenges to these rulings.[1]

### 1. *Enumerated Persons or Bodies*

Dr. Craine contends that KSU subjected him to reprisal for his e-mails to the editor of *Ecology*, Dr. Strong, on October 19, 2013 and February 28, 2014. NSF ruled that these communications were not protected because "[e]ditors of academic journals are simply not qualifying persons under the statute." R. at 966. We agree.

---

[1] We construe Dr. Craine's pleadings liberally but do not act as his attorney. *See Merryfield v. Jordan*, 584 F.3d 923, 924 n.1 (10th Cir. 2009).

10

The statute lists seven qualifying categories of persons or bodies, none of which include editors of periodicals. *See* 41 U.S.C. § 4712(a)(2). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *United States v. Collins*, 2017 WL 1304283, at *5 (10th Cir. Feb. 14, 2017) (internal quotation marks omitted). Although Dr. Craine did eventually involve OIG, a body listed under the statute, he claimed he was facing reprisal—not for contacting them—but for contacting the editor at *Ecology*. This failed to qualify him for relief.

Dr. Craine argues that the editor should be considered a "management official" of KSU under § 4712(a)(2)(G) because *Ecology* reviewed the manuscript and effectively acted as a contractor for KSU.[2] He posits that *Ecology*'s parent corporation receives money from KSU, a portion of which is used to pay its editors' salaries. But Dr. Craine acknowledges that *Ecology*'s parent corporation (not KSU) pays its editors. Because Dr. Craine has failed to show that the *Ecology* editor is a qualifying person under the statute, NSF's conclusion was not arbitrary or capricious.

*2. Protected Disclosures*

NSF also concluded that Dr. Craine's allegations were not protected disclosures because they did not pertain to the subject matter of the Pilot Program. Again, we agree.

---

[2] Dr. Craine does not identify any specific KSU "management official or other employee . . . who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G).

11

The statute requires the disclosure of "gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract . . . or grant." 41 U.S.C. § 4712(a)(1). NSF correctly concluded that Dr. Craine's communications did not fall within the statute. Dr. Craine pointed to the error in the manuscript that a single observer had monitored the LTER site. Dr. Craine questioned Mr. Ratajczak's findings at the initial presentation based on this error; he told Dr. Strong that the manuscript was fraudulent on this basis; he recommended to Dr. Peters that the manuscript be rejected on this basis; he suggested to Dr. Strong in his second e-mail that the authors had made false statements on this point; and he told OIG that he was facing reprisal for reporting this error. Yet reporting a research error is not a statutory basis for protection under the Pilot Program.

On appeal, Dr. Craine offers a new theory: He says that by reporting the academic error, he was, in effect, disclosing a violation of 45 C.F.R. § 689, which addresses misconduct in NSF-funded research. We need not consider this argument, however, because Dr. Craine did not cite this regulation before the agency, nor did he contend that he was reporting a regulatory violation related to an NSF grant. In fact, he affirmatively disavowed that theory to the OIG investigator, stating that "the terms of grants and conditions of grants was not something I was thinking about." R. at 175. Under these circumstances, we will not consider an argument Dr. Craine failed to make before the agency. *See Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1127

12

(10th Cir. 2009) (refusing to consider argument that petitioner failed to raise before the agency).

3. *Reasonable Belief*

Next, NSF determined that Dr. Craine did not reasonably believe that his e-mails to Dr. Strong were protected under the Pilot Program. We conclude that this was neither arbitrary nor capricious.

The Pilot Program requires that employees "reasonably believe[]" that they are disclosing information evincing gross mismanagement, waste, or other harms relating to federal contracts or grants. *See* 41 U.S.C. § 4712(a)(1). When considering the term "reasonable belief" in a separate federal whistleblower statute, we have explained that the term includes "both a subjective and an objective component," which means "an employee must actually believe in the unlawfulness of the employer's actions and that belief must be objectively reasonable." *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1132 (10th Cir. 2013) (examining whistleblower provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1)). "Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (internal quotation marks omitted).

NSF focused on the objective prong, asking whether "a disinterested observer with knowledge of the facts readily ascertainable by the employee could reasonably conclude that there has been misconduct." R. at 967 (internal quotation marks

13

omitted).  NSF ruled that Dr. Craine could easily have learned that the manuscript's

authors had corrected the error, had reanalyzed their data, and had found no impact

on their conclusions.  It further ruled that Dr. Craine could have learned that Dr. Blair

had not removed any data from KSU's on-line database and that the raw data

regarding the number of observers at the LTER site was still available.  Dr. Craine

asserts these facts are untrue, but substantial evidence in the record supports these

findings.  *See, e.g., id.* at 757-58 (Nippert Decl.); *id.* at 820-21 (Blair Decl.).[3]

---

[3] Dr. Nippert signed a declaration acknowledging that Mr. Ratajczak had incorrectly assumed that just one person acted as an observer for the specific dataset used in their research.  R. at 754-55.  But Dr. Nippert explained their assumption was based on previous comments by Dr. Craine, who apparently used the same dataset in his own manuscript without regard for observer bias.  Dr. Nippert stated he and Mr. Ratajczak "reanalyzed all of the data[, and] found multiple lines of evidence that supported the [manuscript's] conclusions, such that observer bias was not (and never was), an issue." *Id.* at 757-58.  Accordingly, they removed an incorrect statement from their manuscript's appendices, which had not been in the manuscript itself. *Id.* at 758.

Dr. Blair also signed a declaration in which he agreed that observer bias did not impact the manuscript's findings.  Additionally, he explained why Dr. Craine could not find the on-line information he was seeking:

> If Dr. Craine had contacted me or . . . the former Konza LTER information manager . . ., we could have explained to him that changes in the Konza LTER database were made due to the LTER Network's new standards for data management and NSF's expectations regarding standardization of data across all LTER sites.

> The database changes involved moving from flat ascii text files, which had been used since the early 1980s, to a relational database format using SQL Server software.  This transition began in 2004 . . . and has continued through the present.  In the SQL Server data, there is no field for observer ID in the PVC021 dataset.  And because [a researcher] later made minor changes to the data gathered by other observers, [the

## 4. Reprisal

Finally, NSF concluded that KSU had not subjected Dr. Craine to a prohibited reprisal. Applying the burden-shifting framework from 5 U.S.C. § 1221(e), NSF concluded that Dr. Craine had failed to show that a protected disclosure contributed to his termination, and that even if it had contributed, KSU presented clear and convincing evidence that it would have fired him anyway. This conclusion was neither arbitrary nor capricious.

NSF provided a rational explanation for its conclusion that a protected disclosure did not contribute to Dr. Craine's termination. NSF observed that KSU fired him because he violated Appendix O of the University Handbook by making malicious and frivolous allegations of fraud to the editor of *Ecology* without first consulting University officials. *See* R. at 968. Dr. Blair invoked Appendix O in his e-mail to Dr. Craine on March 27, 2014, before he or any other KSU faculty member knew that Dr. Craine had threatened to contact OIG. *See id.* Dr. Blair first learned of Dr. Craine's reference to OIG on March 31, 2014. *See id.*; *see also id.* at 691, 822.

information manager] determined that it would be inappropriate to associate the original observer IDs with modified data.

[The] LTER's online data files are consistent with how other LTER sites maintain their online data files for similar datasets.

If any investigator (including Dr. Craine) were to request archival data, Konza LTER can and will provide access to all of the raw data, including copies of the original archived field data sheets, the original ascii text files with uncorrected data and notes detailing any subsequent modifications, and modified files with . . . corrections.

*Id.* at 820-21.

15

And Dr. Craine did not actually involve OIG until after meeting Dr. Blair on April 7, by which time it was apparent that he was facing discipline—not for making a protected disclosure, but for violating Appendix O. As the agency concluded, a protected disclosure was not a contributing factor to his termination from employment.

Further, even if Dr. Craine had made a protected disclosure, NSF explained that KSU presented clear and convincing evidence that he would have been fired anyway for violating Appendix O. *Id.* at 968. As NSF explained, the KSU Inquiry Team concluded that Dr. Craine had provided no evidence to support his accusations, had made no attempt to uncover such evidence, and in fact, had used the same data he alleged to be fraudulent in his own earlier publication. NSF noted that the Inquiry Team concluded Dr. Craine had violated Appendix O by failing "to exercise reasonable caution" before making external allegations of fraud to a prestigious academic journal without first conferring with the authors of the manuscript. *Id.* at 356. Based on these and other findings, the Inquiry Team recommended that he be fired. Provost Mason concurred and terminated him, saying afterwards that she never heard of OIG until she met with Dr. Craine and that his "reference to OIG was inconsequential." *Id.* at 897. She stated that she would have fired him for his "egregious" conduct, even if he had made a protected disclosure. *Id.* at 898. Moreover, NSF recognized that the Grievance Panel voted unanimously to uphold his termination, with full knowledge of Provost Mason's statements and Dr. Craine's earlier threat to involve OIG. This is clear and convincing evidence that Dr. Craine

16

would have been fired for violating Appendix O, regardless of whether he made a protected disclosure. Given such evidence, NSF's conclusion was not arbitrary or capricious.[4]

### 5. *Dr. Craine's Arguments*

Notwithstanding the foregoing analysis, Dr. Craine advances three additional arguments. First, he says the Pilot Program required NSF to notify him of his rights under the statute, and that NSF's failure to do so rendered its decision arbitrary and capricious. But whether or not he had notice of his statutory rights is entirely irrelevant to whether NSF's decision is arbitrary or capricious. Dr. Craine contends the failure to provide such notice can interfere with an employee's rights under other federal statutes, in particular the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-54, and the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-19. *See* 29 C.F.R. § 825.300(e) (addressing consequences for failing to give requisite notice under FMLA); 29 U.S.C. § 203(m) (conditioning wage determination for tipped

---

[4] Dr. Craine contends NSF should have considered three factors in assessing whether KSU would have taken the same action if he made a protected disclosure: the strength of the employer's evidence supporting its action, whether the employer had a retaliatory motive, and whether there was evidence of similar adverse action against non-whistleblowers. *See* Pet'r Br. at 44-53. Dr. Craine offers no authority for applying these factors, but the Merit Systems Protection Board weighs these factors when assessing reprisal under 5 U.S.C. § 1221(e). *See Alarid v. Dep't of Army*, 122 M.S.P.R. 600, 609 (M.S.P.B. 2015). Assuming it was appropriate for NSF to weigh these factors, the agency detailed the evidence and expressly ruled that Dr. Craine's "firing had nothing to do with OIG, and everything to do with [his] having impugned the reputation of [his] colleagues to the editors of an academic journal." R. at 968. NSF did not discuss evidence of similar adverse action against non-whistleblowers because there was none. We perceive no error.

employees in part on providing requisite notice under FLSA). But Dr. Craine cites

no analogous authority under the Pilot Program. And in any event, he was not

prejudiced by any lack of notice because he understood as early as February 28,

2014, that he could involve OIG. That was the date he sent a second e-mail to

Dr. Strong indicating he might need to reach out to OIG. Thus, whether or not NSF

provided notice, Dr. Craine knew he could involve OIG, and yet he elected to contact

the editor instead.[5]

Dr. Craine's second argument raises a due-process challenge to the agency's

decision-making process, which challenge is reviewable under the APA. *See Robbins

v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006). Dr. Craine

focuses on some 200 pages of evidence that KSU compiled during and after his

termination proceedings. This evidence includes letters that KSU sent to Dr. Craine

notifying him of the status of proceedings and the conclusions of the Inquiry Team,

Provost Mason, and the grievance panel; e-mails between Dr. Craine, KSU faculty,

and the editors at *Ecology*; sworn declarations by Dr. Nippert, Dr. Blair, and Provost

Mason; the academic manuscript coauthored by Dr. Craine and Dr. Nippert;

Appendix O of KSU's handbook; and transcripts of OIG interviews. KSU attached

this evidence to a twenty-six page letter that KSU sent to NSF to give the agency its

---

[5] In his reply brief, Dr. Craine insists he was prejudiced because he would have directly contacted OIG rather than the editor if he had known of his rights and remedies under the Pilot Program. He says he did not know about the statute until after he contacted OIG. His second e-mail to the editor refutes this argument, however, as does the OIG intake memo, which clearly indicates that Dr. Craine was alleging retaliation and "requesting federal whistleblower protection," R. at 2.

side of the case. Except for the declarations, it appears this evidence was already part of the record compiled by OIG. Dr. Craine contends NSF violated his due process rights by admitting this evidence during the administrative decision-making process.

Once again, however, Dr. Craine cannot show prejudice. *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."); *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 698-99 (10th Cir. 2002) (rejecting due process challenge to administrative proceeding absent showing of prejudice); *see also St. Anthony Hosp.*, 309 F.3d at 698 ("The duty of establishing prejudice rests upon [the party seeking to set aside the agency's decision]."). None of the contested findings in NSF's decision, all of which we have considered and found immaterial to his rights under the statute, establish that the editor of *Ecology* is a statutorily enumerated person or body, that Dr. Craine's allegations qualify as protected disclosures, that Dr. Craine reasonably believed his emails were protected, and that he was subjected to a prohibited reprisal.

Finally, Dr. Craine asserts NSF should have independently assessed whether his termination violated his First Amendment rights. But resolving this argument is not within the purview of the agency's statutory authority under § 4712(c)(1), and in any event, he failed to raise this argument before NSF, *see Ariz. Pub. Serv. Co.*, 562 F.3d at 1127.

IV

19

The petition for review is denied.

Entered for the Court


Gregory A. Phillips
Circuit Judge