FILED
United States Court of Appeals
Tenth Circuit

July 27, 2018

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

MINDY ARMSTRONG,

    Plaintiff - Appellant,

v.

THE ARCANUM GROUP, INC.,

    Defendant - Appellee.

No. 17-1378

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-01015-MSK-CBS)**
_____

Robert A. McGuire, III, Robert McGuire Law Firm, Lone Tree, Colorado for Plaintiff-Appellant.

Chanda M. Feldkamp, Kelly & Walker, LLC, Denver, Colorado for Defendant-Appellee.
_____

Before **HARTZ**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Mindy Armstrong was employed by The Arcanum Group, Inc., which serves as a placement agency to staff federal-government positions. She was placed with the Real Estate Leasing Services Department of the Bureau of Land Management (BLM). After she complained that BLM employees were falsifying lease-related records, the BLM

demanded that Arcanum remove her from the placement. Her Arcanum supervisor, Steven Cota, could not find an alternative placement for Armstrong and therefore terminated her employment. Armstrong sued Arcanum in the United States District Court for the District of Colorado, claiming that Arcanum retaliated against her for her falsification complaints, in violation of the antiretaliation provisions of the False Claims Act (FCA) and the National Defense Authorization Act (NDAA). The district court granted Arcanum summary judgment, and Armstrong appeals. We affirm because Armstrong did not produce sufficient evidence that Cota had knowledge of her complaints before he terminated her.

I.    **BACKGROUND**

In May 2014, Arcanum contracted to provide the BLM with workers for three positions. Arcanum hired Armstrong to be a BLM lease administrator. She began work in July 2014. One of Armstrong's duties was to prepare a quarterly report that the BLM would submit to the Department of the Interior. Part of the task was to review leases to check the accuracy of a spreadsheet of BLM leases called the Master Report. The BLM leased some space from the General Services Administration (GSA) and some from private lessors. Armstrong believed she found two systematic errors.

One error concerned the distinction between *usable* square feet (USF) and *rentable* square feet (RSF). RSF includes the tenant's share of common areas in the measure of leased space, while USF excludes such areas. Before 2000 many BLM leases referred to USF. But all later leases used RSF; and the GSA charged the BLM rent based on RSF amounts. The BLM did not remeasure leased spaces to convert the older USF

2

leases to the RSF measure. Rather, it approximated the RSF value by multiplying the USF value by 1.15 (the "blanket factor") for use in various documents, including the Master Report. Armstrong believed this was improper under governing GSA policies.

Second, Armstrong believed the Master Report incorrectly omitted measures of *no-cost space*. When private lessors allowed the BLM, as part of a lease, to use certain space for free (the lease reflected the space, but the BLM did not pay more for it), the BLM did not include that space in its Master Report. (As best we can tell, lessors treat leased spaced as no-cost space to keep within square-footage limits in bid specifications.) Leases with no-cost space thus had area measurements differing from those in the Master Report. Armstrong believed GSA policies made this improper as well.

Armstrong told Barbra Burns-Fink—an Arcanum employee working at the BLM as a realty specialist—that lease data were being falsified. Burns-Fink suggested that Armstrong raise her concerns with Terry Baker, the team lead for the Real Estate Leasing Services Department, but Armstrong did not do so at that time. At a team meeting a week later, however, Armstrong asked to speak to Baker privately. Baker responded that she had heard of Armstrong's accusations and insisted that no fraud was occurring. After the meeting another BLM employee met with Armstrong and showed her a BLM policy provision authorizing the use of the blanket-factor conversion, though Armstrong still did not believe that BLM staff had the authority to overrule other operative rules.

Two days later, on October 3, 2014, Baker had two meetings with Armstrong during which they discussed Armstrong's falsification claims and Armstrong expressed "confus[ion] as to what [her] actual job duties were." Aplt. App., Vol. 2 at 271

3

(Armstrong deposition).  Later that day Baker emailed Tina Hamalak, who was the BLM contracting officer for the Arcanum contract, to complain about Armstrong.  The email requested that Armstrong be removed from her BLM position for a variety of reasons, including Armstrong's falsification accusation, her inadequate Excel skills, her failure to ask Baker for guidance when she was confused about her role, and her inability to adjust to the BLM's "unstructured environment."  *Id.* at 346.

Hamalak called Cota's assistant Chelsea Peterson to tell her to remove Armstrong from the BLM position, and Peterson relayed the message to Cota.  Cota called Hamalak to ask about the reasons for removal, but Hamalak provided no details and her confirming email said only that Armstrong was "not working out."  *Id.* at 348.  Before Armstrong's termination, Hamalak did not send Cota or anyone else at Arcanum a copy of Baker's email complaining about Armstrong.  Cota checked whether Arcanum had any other open positions suitable for Armstrong.  Finding none, he decided, without consulting anyone else, to terminate Armstrong.  He held an exit interview with Armstrong later that afternoon.  After he informed her that she was being terminated, she told him—for the first time—of her falsification complaints.  He apparently did not indicate that he had previously heard of the complaints; and he testified at his deposition that he had not heard of her complaints until she told him.

Armstrong's district-court complaint alleged that Arcanum retaliated against her in violation of the FCA, 31 U.S.C. § 3730(h), and the NDAA, 41 U.S.C. § 4712(a), and wrongfully discharged her in violation of Colorado common law.  The district court granted Arcanum summary judgment on the FCA and NDAA claims, and then declined

4

to exercise supplemental jurisdiction over her state-law claim.[1]

## II.   ANALYSIS

### A.   The Governing Statutes' Knowledge Requirement

The FCA is the federal government's "primary tool for redressing fraud claims against the Government."  Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 1:1, at 3 (3d ed. 2016) (hereafter Sylvia).  It "supplements the Government's enforcement efforts by authorizing private citizens with information about fraud to initiate a civil action [a 'qui tam' action] on the Government's behalf."  *Id.*  This "provides the Government a powerful means of combating fraud through an action for multiple damages and penalties."  *Id.*  To protect whistleblowers, the FCA has an antiretaliation provision that imposes liability on an employer if an employee is "discriminated against in the terms and conditions of employment *because of* lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1) (emphasis added).[2]  Such lawful acts are commonly

---

[1]  The decision to decline jurisdiction over the state-law claim is not an issue on appeal.

[2]  The full text of § 3730(h)(1) is as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

5

referred to as "protected activity."[3]

We agree with the parties that one element of a § 3730(h) claim is that the retaliator know of the whistleblower's protected activity. *See U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 729 (10th Cir. 2006) (citing legislative history stating that a § 3730(h) "whistleblower must show the employer had knowledge the employee was engaged in 'protected activity'"); Sylvia § 5:23, at 393 ("The requirement that the defendant have been aware of the plaintiff's protected activity is essential . . . ."). Otherwise, the retaliation could not have been "because of" the protected activity.

Similarly, the antiretaliation provision of the NDAA, 41 U.S.C. § 4712(a)(1), prohibits a government contractor from discriminating against an employee "as a reprisal for disclosing . . . information that the employee reasonably believes is . . . a violation of law, rule, or regulation related to a Federal contract."[4] Again, we agree with the parties

---

[3] Because we affirm on other grounds, we need not address whether Armstrong's complaints were protected activity or whether Arcanum had legitimate nonretaliatory reasons to terminate her.

[4] The complete text of the version of § 4712(a)(1) in effect before 2017 stated:

> An employee of a contractor, subcontractor, or grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in [§ 4712(a)(2)] information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of

6

that one element of a § 4712(a)(1) claim is that a plaintiff's protected activity "'was a contributing factor in the employer's decision to take an adverse employment action.'" Aplt. Br. at 50; Aplee. Br. at 48 (both quoting *Miller v. Abbott Labs.*, Civil Action No. 3:14CV-00363-JHM, 2015 WL 3773114, at *7 (W.D. Ky. June 17, 2015)). Protected activity can play that role only if the employer knew of the activity. *See Craine v. Nat'l Sci. Found.*, 687 F. App'x 682, 685, 692 (10th Cir. 2017) (upholding agency's decision that protected activity of § 4712 plaintiff was not a contributing factor to plaintiff's termination because disciplinary process began before decisionmakers knew of protected activity). Also, we note that § 4712(c)(6) incorporates the "legal burdens of proof specified in [5 U.S.C. § 1221(e)]" for determining in administrative or judicial proceedings whether discrimination prohibited by § 4712 has occurred. And 5 U.S.C. § 1221(e)(1) includes a knowledge requirement. *See* 5 U.S.C. § 1221(e)(1) ("The employee may demonstrate that the disclosure or protected activity was a contributing factor in the personnel action through circumstantial evidence, such as evidence that . . . (A) the official taking the personnel action knew of the disclosure or protected activity; and (B) the personnel action occurred within a period of time such that a reasonable

---

a contract) or grant.

41 U.S.C. § 4712(a)(1) (2012). Section 4712(a)(2) lists various people and entities disclosures to whom are protected; these include various legislative and law-enforcement personnel and (as relevant here) "management official[s] or other employee[s] of [a] contractor, subcontractor, or grantee who [have] the responsibility to investigate, discover, or address misconduct." *Id.* § 4712(a)(2)(A)–(G).

person could conclude that the disclosure or protected activity was a contributing factor in the personnel action."); *Kerrigan v. Merit Sys. Prot. Bd.*, 833 F.3d 1349, 1354–55 (Fed. Cir. 2016) (applying knowledge requirement of § 1221(e)(1)), *cert. denied*, 137 S. Ct. 2180 (2017); *Horton v. Dep't of Navy*, 66 F.3d 279, 284 (Fed. Cir. 1995) (same), *superseded by statute on other grounds as recognized in El v. Merit Sys. Prot. Bd.*, 663 F. App'x 921, 925 (Fed. Cir. 2016).

Thus, we turn to whether Armstrong presented sufficient evidence to satisfy the knowledge requirement. Armstrong argues that the record contains sufficient evidence to support a reasonable inference that Cota knew that she had complained to the BLM about what appeared to be falsification of records. In the alternative, she argues that Arcanum can be liable even if Cota did not have actual knowledge. We reject her arguments.

### B. Cota's Knowledge

To begin with, Armstrong asserts that "Burns-Fink routinely communicated with [Cota and Peterson] about goings-on at BLM," and that based on this "habit of keeping Cota apprised," a jury "could reasonably infer that Burns-Fink also told Cota about the *far more serious matter* of Armstrong making accusations of fraud . . . ." Aplt. Br. at 36 (emphasis added). But Cota testified at his deposition that before deciding to fire Armstrong he did not speak with Burns-Fink and that if Peterson had talked to Burns-Fink, Peterson had not informed Cota of the conversation. And when we look at the evidence Armstrong points to as showing that Burns-Fink and Cota routinely communicated with one another, it turns out to be more supportive of Cota's testimony than contradictory. The only evidence of oral communication is Cota's testimony that he

8

visited the BLM office about once a month "to see how things were going," Aplt. App., Vol. 3 at 450, and that Burns-Fink reported to him on her training of Armstrong when Armstrong began work. Armstrong's only other evidence of communications between Burns-Fink and Cota or Peterson consists of a few emails, in which Burns-Fink reported on the status of Armstrong's federal security background check, when Armstrong would get her work computer, a planned training program for Burns-Fink and Armstrong, and a serious medical incident of Armstrong's. What is missing from those emails, however, is any communication speaking of Armstrong's falsification complaints. Armstrong makes no effort to explain why a communication on that "far more serious matter" would not have been at least alluded to in an email. A party opposing a summary-judgment motion cannot rest on mere speculation or suspicion. *See Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). For a jury to infer from this evidence that Burns-Fink told Cota about the falsification claims would be improper speculation.

The only other evidence that Armstrong relies on to show Cota's knowledge of her falsification complaints (despite his sworn denial) is his deposition testimony that before Armstrong's termination he had been doing some research into issues of "space management" and "common spaces allocations." Aplt. App., Vol. 3 at 469. In her opening brief, Armstrong contends that if Cota was doing this research, someone, probably Burns-Fink, must have told him about Armstrong's assertions of falsification. But Cota had good reasons independent of Armstrong for trying to learn about the issues. He said that he felt he needed to understand them because Armstrong and other Arcanum employees were working on related matters for the federal government. His testimony

9

was as follows:

> Q. Did you ever investigate Barbra Burns-Fink's conduct?
>
> A. I researched—what was it?—space management, common spaces allocations to an extent.
>
> Q. When did you do that?
>
> A. I think I was working on that while [Armstrong] was still there.
>
> Q. You were working on researching a space allocation—
>
> A. Yeah.
>
> Q. —while [Armstrong] was still employed?
>
> A. Uh-huh.
>
> Q. Why were you doing that?
>
> A. Because I have space—spacial [sic] data managers working at GSA [the General Services Administration], because I needed to know how that worked as a process to answer some questions, including questions that [Armstrong] had asked.

*Id.* Although Cota indicated that Armstrong had asked him questions about space management, there is no evidence that those questions were presented in the context of a claim of falsification of records. In particular, Armstrong has never said that she personally told Cota about her falsification concerns before her exit interview.

Cota's testimony that he had conducted his own research into space management is too thin a reed to support a reasonable inference that he knew before the exit interview that Armstrong had accused the BLM of falsifying lease data. Indeed, two days after attending Cota's deposition, Armstrong essentially conceded as much at her own deposition. When asked if she had "reason to believe that prior to the termination meeting on October 3rd with [Cota], that [Cota] knew that you had accused Barbra

10

Burns-Fink and/or Terry Baker of falsification of data," she responded, "Prior to that day, no." Aplt. App., Vol. 2 at 292–93. She reached that conclusion despite having recently heard Cota testify about his research on space management.

## C. Armstrong's Alternative Theories of Knowledge

Armstrong also presents several arguments why Arcanum can be liable even if Cota lacked knowledge of the falsification allegations. First, she says that Arcanum can be liable because Cota "remained deliberately ignorant of BLM's retaliatory motive," so he had constructive knowledge of that motive when he terminated Armstrong. Aplt. Br. at 38. She cites no authoritative support for this theory of liability. But even if the theory is valid, it fails in this case for lack of evidence of deliberate ignorance. There is no dispute that when Cota learned that the BLM wanted Armstrong removed, he called the BLM to request an explanation but was rebuffed. All he received before terminating Armstrong was a follow-up email stating, "Armstrong is not working out and we would like to terminate her effective immediately." Aplt. App., Vol. 2 at 348. Armstrong suggests that because Arcanum's contract with BLM provided only specified circumstances permitting a contract employee's removal,[5] Cota had the right to demand an explanation and his failure to do so constituted deliberate ignorance. But Cota's undisputed testimony was that it was "fairly typical" for clients not to provide reasons

---

[5] The contract states: "The Government may withdraw a previously issued approval or assignment of Contractor personnel to this contract and direct that the individual be removed from the contract based upon the individual not meeting Government expectations or requirements for personal, professional, or performance standards." Aplt. App., Vol. 1 at 218.

11

why they wanted contract employees removed. Aplt. App., Vol. 3 at 447. And Armstrong fails to explain what would have induced Cota to want to be ignorant of the reason for the BLM's action or, more strikingly, what would have motivated Cota to make a request for information that he did not actually want.

Armstrong next argues that even if Cota himself was ignorant of Armstrong's falsification complaints, Arcanum is charged "under agency principles" with knowledge because Burns-Fink (another Arcanum employee working at the BLM) knew of the complaints and she was a "management-level employee" of Arcanum. Aplt. Br. at 39 (internal quotation marks omitted). She relies on *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 755 n.19 (10th Cir. 2014). In that Title VII employment-discrimination case we said that an employer would be charged with knowledge that an employee had been sexually harassed by a coworker if a "management-level employee" knew of the harassment. *Id.* The alleged problem in *Kramer* was that the employer had not protected the plaintiff from sexual harassment despite "knowing" of that harassment. There was an ongoing problem at the office—sexual harassment—and the issue was in what circumstances the employer was responsible for not dealing with the problem. That situation is readily distinguishable from the one before us. Motive was not an issue in *Kramer*. In contrast, in our case the issue is whether a decision was motivated by a desire to retaliate for protected activity. The knowledge of someone who had no role in the decision is irrelevant to the motive for the decision. If no one in the termination decisionmaking process knew of the plaintiff's protected activity, then the protected activity could not be the cause of the termination. A fellow circuit court expressed the

12

point well in another FCA retaliation case in which the only ones with knowledge of the protected activity were not involved in the decisionmaking:

> The broad (and unprecedented) doctrine of constructive knowledge that [the plaintiff] urges would defeat the specific statutory requirement that an employee's termination be 'because of' her protected conduct. The law is clear that it is the decisionmakers' knowledge that is crucial. . . . [C]ompanies are not liable under the False Claims Act for every scrap of information that someone in or outside the chain of responsibility might have.

*Halasa v. ITT Educ. Servs., Inc*., 690 F.3d 844, 848 (7th Cir. 2012). Thus, even if we make the questionable assumption that Burns-Fink was a management-level employee, Armstrong's argument must fail.

This brings us to Armstrong's final effort to establish Arcanum's liability despite Cota's lack of knowledge of protected activity. She invokes the cat's-paw theory that we have recognized in other discrimination contexts. "Under a cat's-paw theory of recovery (also known as 'subordinate bias' or 'rubber stamp' theory), an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). Reviewing a claim for employment discrimination under the Uniformed Services Employment and Reemployment Rights Act, the Supreme Court held as follows: "[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the statute]." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (footnote omitted).

13

(We leave for another day whether our test is more restrictive than *Staub*'s proximate-cause standard.)  The Court "express[ed] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Id.* at 1194 n.4.

We quote in full Armstrong's argument concerning why the evidence here fits the cat's-paw theory:

> Cota's reliance on Hamalak's assertion that Armstrong was "not working out" was clearly blind reliance.  Hamalak, in turn, was merely a middleman passing along the instruction of Terry Baker, who was truly calling the shots for BLM.  Just as Baker had instructed Hamalak to have Cota hire Armstrong, so too did Baker instruct Hamalak to have Armstrong removed.  While Baker was not [an Arcanum] employee, [Arcanum] does not dispute that Baker was a supervisor of Armstrong's on the ground at BLM.  Additionally, the evidence would permit a jury to find that Burns-Fink—who *was* [an Arcanum] employee—both precipitated and facilitated Baker's retaliation against Armstrong.  Ample evidence in the record supports a finding that Burns-Fink exercised supervisory authority over Armstrong.

Aplt. Br. at 40–41 (citations omitted).

We are not persuaded.  Even if Hamalak and Baker could be considered supervisors or co-employees of Armstrong, their discriminatory intent cannot be attributed to Arcanum.  Cat's-paw liability rests on principles of agency law.  *See Staub*, 131 S. Ct. at 1191 (looking to general principles of agency law to determine whether the employer can be liable based on the "discriminatory motive of one of the employer's agents" and "the act of another agent [who had fired the employee]").  Because Hamalak and Baker were BLM employees and not agents of Arcanum, their discriminatory intent, if any, cannot be considered in a cat's-paw analysis of Arcanum's liability.

14

What about the involvement of Burns-Fink?  Armstrong acknowledges that she (Armstrong) personally told Baker on at least two occasions that she thought the BLM was falsifying records and that it was promptly after the final occasion that Baker requested Armstrong's removal from the job.  Armstrong's one-sentence argument in her brief hardly explains how Burns-Fink influenced Baker's request insofar as it was motivated by Armstrong's falsification complaints.  And it is not our role to develop her arguments for her.  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (internal quotation marks omitted)).[6]

## III.  CONCLUSION

We **AFFIRM** the judgment below.

---

[6]  In her reply brief Armstrong argues that Cota literally knew of her falsification complaints before she was terminated, because her formal termination occurred after the exit interview in which she told Cota of those complaints.  This argument comes too late.  Not only was it never raised in district court, but it was not presented in Armstrong's opening brief on appeal, and she makes no request for plain-error review.  We therefore need not address the argument.  *See Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1268 (10th Cir. 2016) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue." (internal quotation marks omitted)); *Evanston Ins. Co. v. Law Offices of Michael P. Medved, P.C.*, 890 F.3d 1195, 1199 (10th Cir. 2018) (if argument is forfeited by failure of party to raise it below, we will ordinarily not consider it on appeal if the party does not request plain-error review).