# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 7, 2023

Lyle W. Cayce
Clerk

No. 21-20620

UNITED STATES OF AMERICA, *ex rel*, CLARISSE CHRISTINE TOLEDO,

*Plaintiff—Appellant*,

*versus*

HCA HOLDINGS, INCORPORATED; PASADENA BAYSHORE HOSPITAL, INCORPORATED; BAYSHORE MEDICAL CENTER, INCORPORATED,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-3683

_____

Before KING, JONES, and DUNCAN, *Circuit Judges*.

PER CURIAM:[*]

Appellant Clarisse Christine Toledo brought retaliation claims under the False Claims Act and the 2013 National Defense Authorization Act

_____

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

against her former employer and its corporate affiliate.[1]  She appeals the district court's order granting Appellees' motion for summary judgment and denying her motion for partial summary judgment.  We AFFIRM.

## BACKGROUND

Pasadena Bayshore Hospital is an inpatient hospital.[2]  It is affiliated with HCA Healthcare, Inc., a nationwide network of healthcare providers. Toledo served as Bayshore's full time Prospective Payment System Coordinator for a few months beginning in February 2017.  In that role, she was responsible for gathering information regarding patients' rehabilitation stays and reporting that information to the Center for Medicare and Medicaid Services ("CMS") via Inpatient Rehabilitation Facility Patient Assessment Instruments ("IRF-PAIs").  She reported temporarily to Ohme Entin, Bayshore's Chief Operations Officer, and informally to Mark Rozell, HCA's Director of Operations for the Gulf Coast Division, until March 2017. When Entin went on maternity leave, Toledo began reporting to Kathyrn Simmons, Bayshore's newly hired Inpatient Rehab Director.  Carrie Capps, the Chief Nursing Officer, became Simmons's supervisor.

Rozell discovered in May 2017 that Toledo had made etiological and impairment group code ("IGC") errors on six out of ten audited IRF-PAIs. Importantly, CMS uses the IGCs reported on the IRF-PAIs to assess Bayshore's compliance with the "60/40 rule," which requires that sixty percent of patients Bayshore admits fall within one of thirteen "compliant" diagnoses.  Rozell, in response, conducted a one-on-one training with

---

[1] Toledo originally brought this action as a *qui tam* suit against Bayshore, its affiliate HCA Healthcare, Inc., and seventy-one other HCA-affiliated hospitals.  The Government declined to intervene, Toledo's *qui tam* claims were dismissed, and the case was transferred to the Southern District of Texas.

[2] "Bayshore Medical Center, Inc." is a non-existent entity.

Toledo, provided her access to webinar trainings on the topic, and sent her to a three-day training and certification course.

Bayshore slipped below the sixty percent compliance ratio in May 2017. Rozell consequently informed Bayshore that ninety percent of its new admissions had to be compliant in order to recover lost ground. When Bayshore's numbers did not improve despite a month-long implementation of the change, Simmons audited Toledo's IRF-PAIs and discovered that Toledo had again entered non-compliant codes for compliant patients. At least one of these codes was entered after she returned from her certification course.

Simmons raised the issue with her direct supervisor, Carrie Capps. Capps then called Rozell, and the two decided to terminate Toledo. As Rozell explained, "[I]t did not seem that [Toledo] was developing based on all that training and education we had gotten her, and I did not think that she was going to be successful in this role if we went forward."

The following day, Toledo called an ethics hotline, asserting Bayshore was engaging in fraudulent practices and insisting she was wrongfully terminated. An internal investigation concluded Toledo's claims were unsubstantiated.

Toledo subsequently brought this action. She moved for partial summary judgment, and Appellees moved for summary judgement. The district court denied Toledo's motion, granted Appellees' motion, and dismissed Toledo's claims. Toledo appeals that judgment.

## DISCUSSION

The False Claims Act ("FCA") prohibits an employer from retaliating against an employee for actions taken "in furtherance" of a *qui tam* suit or for "other efforts to stop 1 or more violations" of the FCA.

31 U.S.C. § 3730(h). Where an employee alleges such retaliation, this court applies the *McDonnell Douglas* burden shifting framework. *Diaz v. Kaplan Higher Educ., LLC*, 820 F.3d 172, 175 n.3 (5th Cir. 2016). "Under this framework, the employee must first establish a prima facie case of retaliation by showing: (1) that he engaged in protected activity; (2) that the employer knew about the protected activity; and (3) retaliation because of the protected activity." *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). The burden then "shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Diaz*, 820 F.3d at 176 (quotation marks and citation omitted). Once articulated, the burden "shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* (quotation marks and citation omitted).

The 2013 National Defense Authorization Act ("NDAA") similarly prohibits retaliation against an employee who discloses to an appropriate party "information that the employee reasonably believes is evidence of . . . a violation of law, rule, or regulation related to a Federal contract." 41 U.S.C. § 4712(a)(1) (amended Dec. 2016). An appropriate party includes a "management official or other employee of the [employer] who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G) (amended Dec. 2016). As with an FCA retaliation claim, an employer must know of the protected activity. *Armstrong v. Arcanum Grp.*, 897 F.3d 1283, 1287 (10th Cir. 2018).

Toledo argues she engaged in numerous instances of protected conduct when she complained to various Bayshore and HCA employees about what she now characterizes as fraud. Assuming arguendo that she did engage in some protected conduct, a *de novo* review of the record reveals that

No. 21-20620

Capps and Rozell, the relevant decisionmakers,[3] were unaware of such conduct, and such conduct did not contribute to her termination.[4] Toledo's retaliation claims under both statutes consequently fail.

It is undisputed that Capps had no knowledge of Toledo's allegedly protected activity. And Toledo admits that she never used words like *fraud* or *illegal* when raising concerns to Rozell. *See Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (no protected activity where plaintiff failed to use words such as *illegal*, *unlawful*, or *qui tam* in characterizing concerns). Even so, Toledo asserts Rozell knew of her allegedly protected activity through their communications regarding (1) therapists' inaccurate documentation of CMS-required therapy minutes, (2) nurses' and therapists' late submission of patient discharge paperwork, and (3) missing admission orders.[5]

As to the first issue, communications between Toledo and Rozell demonstrate Toledo at most characterized discrepancies in therapy minutes as mistakes or possible computer glitches, not fraud. Her communications were therefore insufficient to alert Rozell to allegedly protected activity, especially considering the accurate documentation of therapy minutes was part of her job. *See id.* at 952 (absent use of terms such as *illegal*, *unlawful*, or

---

[3] Undisputed testimony demonstrates Capps and Rozell did not consult Simmons regarding Toledo's termination, and Simmons did not volunteer her opinion.

[4] At the pretext stage, the FCA "requires a showing of but-for causation." *Garcia*, 938 F.3d at 243–44. This court has yet to address the causation standard for NDAA retaliation claims. But Appellees concede the "contributing factor" standard applies. *See Armstrong*, 897 F.3d at 1287. We consequently apply that standard for the purposes of this appeal.

[5] Toledo also points to Simmons's request that Toledo "back-date" admission orders and change IGCs from non-compliant to compliant. But she never reported either issue to Rozell, nor does she provide evidence that he otherwise knew of Toledo's complaints.

*false-claims investigation*, actions taken consistent with job duties failed to alert employer to protected activity).  Toledo's single email addressing therapists' use of group therapy to satisfy CMS-required therapy minutes was likewise insufficient to alert Rozell to allegedly protected activity.  Rozell in fact testified that use of group therapy does not violate CMS regulations.

As to the second issue, Toledo once asked Rozell whether data from late discharge paperwork could be used on IRF-PAIs.  As Toledo's job involved the input of discharge paperwork data into IRF-PAIs, her question was insufficient to alert Rozell to allegedly protected activity.  *See id.*  Indeed, in response to Toledo's inquiry, Rozell stated that such data could be used if properly documented.

As to the third issue, Toledo told Rozell that "she found 5 patients admitted to rehab without a physician admit order."  Again, Toledo's position required her to report patients' admission dates, which are contained in their admission orders.  *See id.*  Toledo notes, however, that Rozell stated that "it was not her job to look in the charts for the admission order."  And Appellees confirm that CMS requires patients to have admission orders on file.  Even assuming Toledo's single report could constitute protected conduct sufficient to alert Rozell, Toledo has presented no evidence that such conduct—or any of the previously addressed conduct—contributed to her termination.[6]  Indeed, Toledo testified that

_____

[6] Toledo contends Capps and Rozell mistakenly believed she made IGC errors that affected Bayshore's compliance ratio.  The record does not support that their "beliefs" were mistaken.  Regardless, evidence that Toledo's coding errors did not affect Bayshore's compliance ratio "would establish only that the proffered justification was mistaken, not dishonest, which is the key to pretext." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 564 (5th Cir. 2019); *see also LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (noting an employer is not required "to make proper decisions, only non-retaliatory ones").

No. 21-20620

Rozell responded appropriately to her concerns in every instance and at no point did she feel that he mistreated or retaliated against her. She consequently has not shown Bayshore's legitimate, non-retaliatory reason for firing her was pretext for retaliation.

## CONCLUSION

Because Toledo has not presented a genuine dispute of material fact as to whether the relevant decisionmakers knew of her allegedly protected conduct or whether her allegedly protected conduct contributed to her termination, her retaliation claims fail. The judgment of the district court is AFFIRMED.