**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 20, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

QUENTIN L. SASSER,

     Plaintiff - Appellant,

v.

SALT LAKE CITY CORPORATION, a
Utah municipal corporation; DAVID
TERRY, in his individual capacity; LYNN
LANDGREN, in his individual and official
capacity,

     Defendants - Appellees.

No. 17-4198
(D.C. No. 2:15-CV-00606-DN)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

For years, Quentin L. Sasser, an African American, worked as a seasonal

employee at several of the Salt Lake City Corporation's (City) municipal golf

courses. In spring 2011, Sasser applied for a full-time position as the First Assistant

Professional at the City's Mountain Dell Golf Course. At the time, Sasser was the

only African American that the City's Golf Division had ever hired. Sasser was not

selected for an interview, and the position was eventually filled by a white applicant.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This suit followed, alleging that the City had racially discriminated against Sasser by failing to promote him to the position. The district court granted summary judgment in the City's favor, holding that Sasser had failed to establish that the City's stated reasons for denying him the position were pretextual. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

The City's Golf Division manages six[1] golf courses in the greater Salt Lake City area. Sasser worked as a part-time seasonal employee at two of these courses over two separate periods: from 1993 to 2000 and from 2006 to 2012. In 1993, he took a position at Wingpointe Golf Course caring for golf carts and gathering golf balls on the driving range. Sasser proved himself, and for the next six-and-a-half seasons (*i.e.*, through 2000), he worked at Wingpointe as a Golf Starter, assisting with pro-shop and driving-range operations.[2] Meanwhile, in 1997, Sasser began pursuing his PGA certification, which he eventually achieved in 2006—becoming Utah's sole African American PGA-certified professional.

---

[1] When Sasser initiated this litigation, the City managed seven courses. One of those courses—Wingpointe Golf Course—has since closed.

[2] A Golf Starter had a variety of responsibilities in the pro shop and on the driving range. According to the job description, a Golf Starter assisted in pro-shop operations by assigning and scheduling course-play and practice-range times and by keeping the pro shop "clean and orderly." *See* Appellant's App. vol. 3 at 630. A Golf Starter also directed driving-range operations, gathered golf balls and baskets on the range, refilled the range dispenser, and kept the range "clean and free of litter." *Id.* Sasser described all these responsibilities as providing "counter help." Appellant's App. vol. 3 at 558:23. It isn't clear, though, how much time Sasser spent in the pro shop versus on the driving range.

For much of his employment with the City, Sasser worked under the direct supervision of Lynn Landgren—Wingpointe's Head Professional and a longtime fixture of Utah's golfing community. Starting in 1995, Landgren opened a file on Sasser in which he documented Sasser's missteps—the only such file that Landgren ever maintained in his 28 years with the City's Golf Division.[3] Landgren later claimed that he had maintained the file as a defensive measure, fearing that Sasser might "pull[] the race card" and initiate litigation in response to any disciplinary action. Appellant's App. vol. 5 at 959:17–18. The file documented nine negative observations from October 1994 to May 1998, such as no-shows and failures to ring up golf lessons. Landgren discussed only some of these observations with Sasser.

In September 1995, Tammy Nakamura, head of a golf association comprised primarily of Japanese Americans, complained about Sasser's conduct at an event at Wingpointe. Nakamura recalled offering to help Sasser and two other starters whom she overheard struggling to pronounce her Japanese associates' names. According to her, the starters rudely declined, and Sasser quipped that it would be better if the players had American names. Nakamura found the remark "extremely inappropriate," especially for a starter in "direct contact with the public." *Id.* vol. 3 at 631. When Sasser went to inform Landgren about the incident, Landgren stated that he'd already received a complaint about Sasser's comment. Yet, rather than discipline Sasser,

---

[3] In his deposition, Landgren clarified that he kept files for all employees in which he collected letters that customers submitted about those employees, but that he added notations to only Sasser's file.

Landgren simply added Nakamura's complaint and a handwritten note[4] to Sasser's file. Landgren didn't document any similar problems after 1995.

In August 2000, Sasser resigned his position at Wingpointe for a management opportunity as Tournament Director at Coral Canyon Golf Course, a private facility in St. George, Utah. Sasser worked at Coral Canyon until 2002, when he accepted a position at Fore Lakes Golf Course, a private golf facility in Salt Lake City. Sasser taught golf lessons and helped with maintenance at Fore Lakes until October 2006.

In November 2006, Landgren rehired Sasser as a Golf Starter[5] at Wingpointe. After that, Sasser didn't return as a Golf Starter because Landgren claimed that he "didn't have . . . any space available" in the pro shop. *Id.* vol. 2 at 374:353 (12–13). Instead, for the next three seasons, Sasser worked at Wingpointe as a Golf Teaching Professional and assisted on an as-needed basis in the pro shop. Sasser then accepted an "unskilled" maintenance job at Wingpointe as a Golf Groundskeeper during the

---

[4] On the complaint, Landgren scrawled the words "Pearl Harbor Comment?" Appellant's App. vol. 3 at 631. Supposedly, when Nakamura or one of her associates inquired where the first tee was, Sasser said, "You didn't have any problem finding Pearl Harbor you shouldn't have any problem finding the first tee." *See* Appellant's Open. Br. at 12–13. Sasser denies making such a comment, and Nakamura didn't mention it in her written complaint, though she separately telephoned Wingpointe's "gold office" to complain and may have mentioned the comment on that call. *See* Appellant's App. vol. 3 at 18–25. Landgren, for his part, claimed to have heard the comment from one of the organization's "many members." *Id.* vol. 2 at 445:2–7. Regardless of the source, Landgren apparently shared the "more offensive, Pearl Harbor version" of the incident with others. Appellant's Open. Br. at 13.

[5] Three months later, in February 2007, Sasser was reclassified as a Golfer Relations Specialist, with largely the same job responsibilities as a Golf Starter, including assisting in pro-shop operations.

4

2010 and 2011 seasons—working for the first time under the supervision of someone other than Landgren. *Id.* vol. 3 at 635. Meanwhile, from 2008 through the 2011 season, Sasser taught junior golf lessons at Nibley Park Golf Course.

After returning to work for the City in 2006, Sasser applied—unsuccessfully—for promotions to three full-time positions. In 2007, Sasser applied for an Assistant Professional position (likely for either Forest Dale or Nibley Park golf courses), and the City's Golf Director, David Terry, selected him for an interview. Sasser ranked last among the interviewees, however, and didn't advance to the second round. Later, in 2010, Sasser applied for the Head Professional position at Nibley. This time, Sasser didn't get an interview, because he lacked the minimum qualifications for the position, *i.e.*, a four-year degree. Ultimately, Jeremy Green, a longtime Assistant Professional at both Wingpointe and Mountain Dell Golf Courses, was selected for the position.

In February 2011, Sasser applied for an Assistant Professional position at Mountain Dell, leading to the hiring process at issue in this litigation. According to the online job posting, an Assistant Professional manages course-play, practice-range, and pro-shop operations while providing administrative backup and teaching golf lessons. Applicants were prompted to manually fill out an online application form, listing personal information and relevant employment history, and to upload a resume. Despite having extensive relevant experience, Sasser omitted much of it from his online application. Indeed, Sasser listed just two previous jobs in the application, both of which he described as maintenance/teaching positions: his job at

Fore Lakes from 2002 to 2006 and his job at Wingpointe from 2006 onward (even though he was a Golf Starter in 2006).[6] Sasser also listed his PGA certification.

Sasser was one of 28 individuals who applied for the Assistant Professional position. Of those 28 applicants, five (including Sasser) encountered a software issue that prevented them from uploading a resume with their application. Terry noticed these omissions and reached out to two of the applicants—Jeremy Miller and J.Z. Davis—to correct the discrepancy. Miller and Davis, both white, had worked for years in pro shops at City golf courses as Golf Starters and/or Golfer Relations Specialists. Terry didn't similarly contact the other three applicants (two white applicants and Sasser) who had encountered issues in submitting resumes.

Terry assembled a four-person hiring panel to review applications for the position: himself, Landgren, Michael Brimley (Head Professional at the City's Mountain Dell Golf Course), and Derek Schmehl (Head Professional at the City's Rose Park Golf Course). Terry directed the other panelists to independently review application materials and to rank their top-ten candidates "based on how well the candidate[s'] skills and experience match the responsibilities listed in the attached

---

[6] Sasser contends that his online application also referenced "golf shop management," citing what he calls the "second part" of the application. Appellant's Reply Br. at 19. But the purported "second part" is clearly Sasser's application for Nibley's Head Professional in 2010 and not his application for the 2011 Assistant Professional position. *Compare* Appellant's App. vol. 4 at 715–16 (alleged "second part" of 2011 Assistant Professional application), *with id.* vol. 2 at 418–19 (identical 2010 Head Professional application). Indeed, the "second part" states that Sasser's "Objective" is "Seeking a . . . position as Head Golf Professional." *Id.* vol. 4 at 715. Sasser's attempt to cast a different application as his application for the Assistant Professional position is disingenuous.

job description." *Id.* vol. 2 at 341. From this initial ranking, eight candidates would be selected for interviews.

In the panelists' initial rankings, only Terry listed Sasser as a top-ten candidate (ranking him tenth). As a result, Sasser wasn't selected for an interview. Terry later justified his ranking based on what he perceived as Sasser's lack of recent pro-shop experience, which he considered critical for the position. *Id.* at 313:20–24 (explaining that Sasser had been "spending very little time, if any, . . . working in a pro shop"). Landgren worried that Sasser "comes over a little hard to people" and is "[a] little rough," which isn't ideal in a pro-shop environment. *Id.* vol. 3 at 662:8–14. Brimley, for his part, commended Sasser for his playing and teaching skills, but he thought that Sasser lacked sufficient knowledge of software used in the pro shop (*i.e.*, point-of-sale and tournament software) to be an Assistant Professional "[a]t this point in his career." *Id.* at 646:5–21. Meanwhile, Schmehl found the experience listed on Sasser's online application—maintenance work and teaching golf—irrelevant.

All four panelists ranked the same nine candidates in their top-ten lists, so they proceeded to interview nine candidates instead of eight. Among those candidates, Miller scored the highest and was selected for the position. In an email to Rick Graham, the City's Public Services Director, Terry announced this selection and noted that Miller had assumed many duties relevant to the position after Nibley's Assistant Professional abruptly resigned in the previous year. Terry also noted that Miller had "made continual progress towards PGA membership." *Id.* vol. 2 at 342.

7

In May 2015, Sasser filed a complaint in Utah state court alleging that the City's failure to promote him to the Assistant Professional position constitutes (i) discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5; and (ii) discrimination on the basis of age, in violation of the Age Discrimination Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq*. Sasser also asserted a race-discrimination claim against Terry under 42 U.S.C. § 1983. In August 2015, the City and Terry removed the action to federal court, and in April 2017, Sasser filed an amended complaint, adding Landgren as a defendant and asserting a new 42 U.S.C. § 1981 claim against the City, Terry, and Landgren.

The defendants filed a joint motion to dismiss Sasser's §§ 1981 and 1983 claims on April 26, 2017, which the district court granted on December 1, 2017. After discovery concluded, the City moved for summary judgment on Sasser's Title VII and ADEA claims. Sasser conceded that summary judgment was proper against his ADEA claim but cross-moved for partial summary judgment on his Title VII claim. On December 4, 2017, the district court granted the City's motion against Sasser's Title VII claim, rendering moot Sasser's partial-summary-judgment motion.[7] Sasser timely appealed the decision on December 21, 2017.

## ANALYSIS

Sasser challenges the district court's grant of summary judgment in the City's favor on his Title VII race-discrimination claim. He argues that the City's proffered

---

[7] The district court did not deny Sasser's motion, but rather held that the motion was moot.

reasons for failing to promote him—then the only African American ever to work for the City's Golf Division—are a pretextual façade designed to mask invidious race discrimination. The City maintains the neutrality of its proffered reasons.

Title VII forbids an employer from discharging or otherwise discriminating against any individual on the basis of race. 42 U.S.C. § 2000e-2(a)(1). Absent direct evidence of discrimination, a plaintiff asserting a failure-to-promote claim under Title VII must follow a three-step, burden-shifting framework.[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03 (1973); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). The plaintiff must initially establish a prima facie case of race discrimination. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). If the plaintiff does so, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer does so, the burden then shifts back to the plaintiff to proffer evidence that the employer's stated reason for its decision is pretext. *Id.*

Here, it is undisputed that Sasser has established a prima facie case of race discrimination regarding the hiring process for the Assistant Professional position in 2011. As the district court reasoned, Sasser, a member of a protected class, was "at the very least[] minimally qualified" for an advertised job that was awarded to a white applicant. Appellant's App. vol. 2 at 271. It is likewise undisputed that the City

---

[8] Sasser doesn't purport to have direct evidence that the City's failure to promote him resulted from racial discrimination. Rather, he urges an inference of pretext based on circumstantial evidence under the *McDonnell Douglas* framework.

has articulated legitimate, nondiscriminatory reasons for not promoting Sasser. These include Sasser's lack of recent experience working in a pro shop; his questionable customer-service skills; his limited proficiency in relevant software programs; and his online application listing only experience irrelevant to the position. The parties dispute only whether Sasser has carried his burden of showing that these reasons are pretextual.

To avoid summary judgment on a pretext theory, a plaintiff must establish a genuine issue of material fact that "a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). This is often satisfied by exposing "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason,' such that a reasonable fact finder could deem the employer's reason 'unworthy of credence.'" *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (brackets omitted) (quoting *Garrett*, 305 F.3d at 1217). But "mere conjecture that the[] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

In assessing evidence of pretext, "we examine the facts as they appear to the person making the decision," taking care not to "second guess the business judgment of the employer." *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001) (citation and internal quotation marks omitted). The evidence must create a factual issue that the "*employer* didn't really believe its proffered reasons for

10

[the] action and thus may have been pursuing a hidden discriminatory agenda."
*Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (emphasis added). Thus, rather than ask whether the employer's stated reasons were "wise, fair or correct," we inquire whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (citation omitted).

Though the parties analyze pretext in terms of the City's "failure to promote" Sasser, the "ultimate hiring decision cannot be viewed in isolation," because Sasser didn't even receive an interview. *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002). Instead, because the City's decision not to interview Sasser "effectively operated as a decision not to hire [him]," the inquiry centers on whether the City's "stated reasons for failing to give [Sasser] an interview may be unworthy of belief." *See id.* at 1250–51. Absent evidence that Sasser was discriminatorily excluded from competing for the position in the first instance, the City's hiring decision *after* the interview process cannot be suspect.

To satisfy his burden of showing pretext, Sasser offers evidence regarding (i) Landgren's "racial animus" toward him; (ii) the City's differential treatment of black and non-black employees and the hiring panel's differential treatment of black and non-black interviewees for the position; (iii) the hiring panel's "subjective standards" as well as "procedural irregularities" in the application process; and (iv) Sasser's superior qualifications to Miller, the prevailing candidate. Sasser doesn't argue that any of this evidence is alone sufficient to render unbelievable the City's stated

11

reasons for not interviewing (and thus, not promoting) him. Rather, he insists that the evidence, taken in its totality and viewed in the light most favorable to him, could lead a reasonable jury to conclude that the City's proffered reasons were pretextual.

We review de novo whether Sasser has shown a genuine issue of fact as to pretext, viewing the factual record and any reasonable inferences therefrom in the light most favorable to Sasser as the nonmovant. *See Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371, 1378 (10th Cir. 2015). In conducting this inquiry, we consider the evidence "in its totality" rather than in isolation. *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008). But Sasser can't defeat summary judgment by resting "on ignorance of facts, on speculation, or on suspicion." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Moreover, we disregard as immaterial any "unsupported claims" or "conclusory allegations." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).

## I.     Evidence of Landgren's Racial Animus Toward Sasser

Sasser initially argues that Landgren harbored racial animus toward him and that this animus negatively influenced Landgren's perception of his qualifications for the Assistant Professional position. Sasser further argues that Landgren's racial animus impacted the other three panelists' assessments. The record tends to support the former but not the latter argument.

As a threshold matter, there is little evidence that Landgren harbored animus toward Sasser—racial or otherwise. The only evidence on this score is that, when Sasser worked under Landgren's supervision in the 1990s, Landgren scrutinized and

12

secretly recorded Sasser's missteps in a file. Though Landgren maintained a "file for letters" that he received about all employees, he kept a separate file for only Sasser in which he added notations on Sasser's missteps. Appellant's App. vol. 5 at 948:9–949:5. Sasser fixates on Landgren's admission that he added these notations because he feared Sasser might "pull[] the race card" in the event of disciplinary action. *Id.* at 959:17–18. Yet this rationale suggests that the file was a precautionary measure, not a symptom of invidious animus. Indeed, Landgren indicated that he "like[s]" Sasser and that Sasser "was good to" him; he simply created a record to defend against a potential race-discrimination lawsuit. *Id.* at 959:12–960:5.

Nonetheless, the evidence, construed in Sasser's favor, supports an inference that race was at least a motivating factor in Landgren's decision against interviewing Sasser for the position. Even if Landgren created the file as a defensive measure, he did so for racial reasons. Later, Landgren found Sasser unqualified for the position based in part on the "[p]ast performance" that he had documented in the file. *Id.* vol. 2 at 452:21. True enough, as Sasser's former supervisor, Landgren likely would have recalled Sasser's missteps—particularly his role in the "Japanese names" incident—even without the file. And Landgren would have been justified in accounting for what he knew; merely because he recorded Sasser's misconduct in a file that he created for racial reasons doesn't immunize Sasser from responsibility for that misconduct. Still, Landgren cited the file as grounds for his decision against Sasser, meaning he based his decision, in part, on a record of misconduct that he created for racial reasons.

In the context of this case, though, Landgren's racial motivation isn't alone sufficient to create a genuine issue of material fact as to pretext. In the first instance, evidence of a single panelist's impropriety has limited relevance where the panelist's decision didn't determine the adverse employment action. Here, Landgren served as one of four panel members who initially evaluated applicants. Had his evaluation determined whether Sasser received an interview, his racial motivation would present strong evidence of pretext. But his evaluation didn't keep Sasser from an interview; only one panelist (Terry) ranked Sasser as a top-ten candidate.[9] And Sasser offers no evidence to the contrary, *i.e.*, that but for Landgren's vote against interviewing him, he would have received an interview. *Cf. Burns v. Bd. of Cty. Comm'rs*, 330 F.3d 1275, 1285 (10th Cir. 2003) (finding no pretext where the plaintiff proffered no "evidence that the outcome would have been different had [a racially motivated board member] abstained from voting" to reinstate the minority plaintiff's employment).

In addition, Sasser offers no evidence that Landgren's racially based action toward him influenced the other panelists' decisions. Sasser doesn't contend that Landgren exerted *direct* influence by communicating a racial bias against Sasser to the other panelists. Indeed, he doesn't allege that Landgren even mentioned his opinion of Sasser's past performance to the other panelists during the hiring

---

[9] True, Landgren wielded "at least 25% decision making authority" over who would receive an interview, Appellant's Reply Br. at 6 n.1, but the other 75% of panelists effectively mooted that authority by ranking Sasser either tenth (Terry) or outside their top-ten lists (Brimley and Schmehl).

process.[10] Rather, he argues that Landgren's bias *indirectly* affected the other panelists' decisions. He proffers two examples.

Sasser argues, first, that panelists penalized him for his demeanor based on the 1995 "American names" incident that Landgren had documented in his secret file. Sasser presumably relies on a "subordinate bias" theory,[11] under which a Title VII plaintiff may show pretext by establishing that an employer's legitimate reasons are based on a biased subordinate's "discriminatory reports, recommendation, or other actions." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487 (10th Cir. 2006). The theory requires evidence that the subordinate (i) "perform[ed] an act motivated by [discriminatory] animus that is *intended* . . . to cause an adverse employment action" and (ii) that the act proximately caused such an action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

---

[10] Notably, the record doesn't reflect that the panelists ever discussed who to interview for the Position. Terry e-mailed the panelists on February 9, 2011, instructing them to rank their top-ten candidates. Terry cautioned the panelists not to "discuss with anyone at this time" and indicated that, if the panelists' rankings overlapped such that there was "agreement as to the candidates we should interview," then it wouldn't be necessary to convene a meeting about the applicants. Appellant's App. vol. 2 at 341. Landgren evidently e-mailed his top-ten list first, so Terry typed that list and then handwrote the other panelists' lists in the margins. The lists substantially overlapped, with unanimous agreement on nine applicants and three votes for a tenth candidate. Given this agreement, there would have been no need to convene a meeting on whom to interview.

[11] *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 912 & n.7 (10th Cir. Mar. 16, 2011) (considering a subordinate-bias theory where the plaintiff didn't explicitly use that term).

Even assuming Landgren is a "subordinate" within the theory's meaning,[12] Sasser's argument fails. Sasser asserts that Landgren told Terry about the incident in 2006 and that Terry recalled the incident during the 2011 hiring process. Yet Sasser offers no evidence that racial animus motivated Landgren when he told Terry about the incident or that Landgren intended the information to harm Sasser's employment. Sasser also adduces no evidence of causation. Terry simply recalled during his deposition that Landgren had told him about the incident, but he never indicated that Sasser's demeanor was even a factor in his evaluation of Sasser's candidacy for the position. Terry's mere knowledge of the incident doesn't establish his *reliance* on the incident. But even then, Terry arguably would have been justified in accounting for Sasser's past misconduct regardless of how he learned about it.

Sasser also asserts that Brimley, having "heard" about the incident at some point,[13] faulted Sasser for his "reputation" for being "abrupt" with customers. Appellant's Open. Br. at 23. Yet Sasser omits that Brimley heard about the incident from the Japanese golfers who played the event in 1995 at which the incident occurred and *not* from Landgren. *See* Appellant's App. vol. 2 at 333:3–334:2 (noting Sasser's "reputation" among these golfers); *id.* at 336:2–6 (stating that "[i]t was a golfer" who relayed the story). Sasser also omits that Brimley explicitly denied

---

[12] The biased subordinate must "lack[] decisionmaking power," *BCI Coca-Cola Bottling Co.*, 450 F.3d at 484, but here, Landgren was a decisionmaker on the disputed employment action, *i.e.*, whether to interview Sasser.

[13] Sasser seems to imply that Landgren told Brimley about the incident, though the record is devoid of such evidence.

relying on the incident as a factor in his evaluation of Sasser for the position—though again, Sasser isn't absolved from blame for his misconduct simply because Landgren recorded it in a secret file.[14]

Second, Sasser avers that Landgren's not hiring him to work as a Golf Starter in Wingpointe's pro shop after the 2006 season deprived him of the exact experience that Terry and Brimley later faulted him for lacking, *i.e.*, recent pro-shop experience. According to Sasser, Landgren's action was "intertwined" with the other panelists' adverse decisions. Appellant's Open. Br. at 40. Again, Sasser seemingly relies on a "subordinate bias" theory in that he posits that the panelists' decisions were based on Landgren's past "discriminatory . . . actions." *See BCI Coca-Cola*, 450 F.3d at 487.[15] This argument fails on multiple levels.

---

[14] Moreover, even if Brimley discounted Sasser's candidacy based on his knowledge of the incident, that assessment would have been unrelated to any racial motivation by Landgren, because Brimley heard about the incident from firsthand participants and not from Landgren.

[15] In his brief, Sasser cites *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005), where we noted that a "successful attack on part of the employer's legitimate, non-discriminatory explanation" is sufficient if the stated reasons are "so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid." *Id.* at 1310. Yet Sasser doesn't argue that Landgren's reasons for not interviewing him were intertwined with the other panelists' reasons. Rather, he argues that the panelists' reasons were intertwined with Landgren's *past actions*, *i.e.*, Landgren's refusal to place Sasser in the pro shop.

This argument more closely resembles the "subordinate bias" theory discussed above, and thus, we entertain the argument under that line of analysis. We recognize, however, the questionable utility of that theory. Far from a "subordinate," Landgren was the decisionmaker regarding pro-shop staffing needs in 2007 and one of four decisionmakers regarding interviews for the Position in 2011.

In the first place, the record contains little information about Sasser's efforts to work in the pro shop after the 2006 season. The only evidence is Sasser's testimony that Landgren denied him a pro-shop position because the shop "didn't have . . . any space available." Appellant's App. vol. 2 at 374:353 (12–13). But nothing indicates that the pro shop had an open position to fill by the time Sasser asked, nor is there evidence about the hiring process, the applicants, or the successful applicant. Sasser doesn't even allege that he formally applied for an open pro-shop position, just that he "asked" to work in the pro shop. *See* Appellant's Open. Br. at 16.[16] Absent such factual development, we cannot divine why Landgren didn't again hire Sasser to work in the pro shop.

More important, Sasser offers no evidence of racial discrimination specific to Landgren's refusal to permit him to work in the pro shop. *See Staub*, 562 U.S. at 422 (requiring evidence of "an act motivated by [discriminatory] animus"). He asserts only that, "despite Sasser's request [for pro-shop work], Landgren did not return Sasser to the pro shop." Appellant's Reply Br. at 8. But the mere denial of Sasser's request, without more, doesn't evince race discrimination. Absent evidence that the

---

[16] In his opening brief, Sasser contends that he "asked repeatedly if there was an opening" in the pro shop, and that Landgren "denied him the position from 2007 through 2009." Appellant's Open. Br. at 16. Yet the record reflects that Sasser requested to return to the pro shop only once, in 2007, and that Landgren denied that single request. Implicitly recognizing this limitation, Sasser backs off the "repeated requests" characterization in his reply brief, arguing only that "Landgren refused to permit him a pro shop position shortly after Sasser returned to City employment in 2006." Appellant's Reply Br. at 7; *see also id.* at 8 (referring to "Sasser's *request*") (emphasis added).

decision was motivated by discriminatory animus, we see no reason to second-guess Landgren's business judgment about who worked in the pro shop. *See Selenke*, 248 F.3d at 1261. And, if that decision wasn't discriminatory, then the other panelists' assessment that Sasser lacked recent pro-shop experience couldn't have been "intertwined" with any discrimination.

Sasser tries to bootstrap this argument by characterizing Landgren as having "admitted" harboring a general "race animus" toward him (by keeping the secret file on his missteps), meaning "a reasonable jury could conclude that he denied Sasser pro shop work for discriminatory reasons." Appellant's Open. Br. at 41. As explained above, however, nothing suggests that Landgren harbored any animus toward Sasser. And his racial motivation for creating a file on Sasser doesn't render invidious *every* decision he ever made; Sasser's attempt to extrapolate from evidence of general bias to specific discrimination rests on speculation alone. *See Bones v. Honeywell Int'l., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("mere speculation, conjecture, or surmise" cannot defeat summary judgment). In fact, Sasser doesn't even allege that Landgren denied him a pro-shop opportunity based on any missteps that Landgren recorded in his secret file—though we doubt that by recording the missteps Landgren somehow immunized Sasser from them being considered. When making staffing decisions, a supervisor is certainly justified in factoring in what he knows about an employee's past misconduct. In any case, we decline to infer a nexus between Landgren's actions and the file that Sasser doesn't himself allege. *See Armstrong v. Arcanum Grp., Inc.*,

19

897 F.3d 1283, 1291 (10th Cir. 2018) ("[I]t is not our role to develop [the parties'] arguments for [them].").

Moreover, the record supports the legitimacy of Landgren's decision. As Sasser admits, Landgren hired him as a Golf Starter in 2006 and later permitted him to work in the pro shop on an as-needed basis. A reasonable jury couldn't infer racial discrimination from the denial of Sasser's request for pro-shop work in 2007 when Landgren had hired Sasser for the same job in 2006 and had Sasser work in the pro shop as needed thereafter. Nor, for that matter, could a reasonable jury infer a general racial animus motivating *all* of Landgren's decisions, as Sasser posits. It is worth remembering that Landgren hired Sasser for seven consecutive seasons in the 1990s as well as four more years from 2006 to 2009 after Sasser returned to Salt Lake City.

In short, Sasser has raised a genuine issue of fact about whether race was a motivating factor in Landgren's decision against interviewing him for the position, at least to the extent that Landgren relied on his racially based file on Sasser. But to the extent that Landgren relied on his independent recollection of those events, there is no Title VII issue; Landgren's memorialization of Sasser's misconduct in a racially based file doesn't somehow immunize that misconduct from consideration. As for the other panelists, Sasser hasn't raised a genuine issue of fact that their rankings might similarly have been racially motivated, or that Landgren's racial motivation in creating the file influenced their rankings.

## II.    Evidence of Disparate Treatment of Black and Non-Black Employees and of Black and Non-Black Interviewees

Sasser alleges, next, that Landgren scrutinized and disciplined him "more harshly than his non-black coworkers" when he worked at Wingpointe. Appellant's Open. Br. at 46. Sasser also argues that the panelists applied "different and less favorable standards" to him in the hiring process for the position than to his non-black competitors. *Id.* We address these arguments in turn.

### A.    Disparate Treatment Vis-à-vis Coworkers

The lynchpin of a disparate-treatment claim is a showing that the plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). Employees are "similarly situated" if they "deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (citations omitted).[17] Further considerations include "relevant employment

---

[17] Sasser disputes this characterization, asserting that the focus on a shared supervisor and on shared evaluation/discipline standards is limited to failure-to-discipline cases. He argues that, in failure-to-promote (or interview) cases like this one, the focus is instead on the "supervisor with responsibility for promoting or recommending promotion." Appellant's Reply Br. at 11–12. If Sasser suggests that these are *different* tests, we disagree. A disparate-treatment theory requires a baseline showing that comparable employees "deal with the same supervisor and are subject to the same standards." *See Aramburu*, 112 F.3d at 1404. For purposes of a failure-to-promote or interview theory, the relevant "supervisor" is "the supervisor with responsibility for promoting or recommending promotion." *Muhleisen v. Principi*, 73

circumstances, such as work history and company policies" applicable to the comparable employees. *Id.*

Landgren's admission that he took the unprecedented action of maintaining a secret file to record Sasser's missteps establishes, at a minimum, that he singled out Sasser for heightened scrutiny. But evidence that Landgren *treated* Sasser differently from his non-black coworkers is attenuated at best. Sasser avers that, after Nakamura complained about three Golf Starters' disrespectful comments when she tried to help them pronounce her Japanese colleagues' names, Landgren recorded and later relayed to Terry only Sasser's role in the incident. Yet it was *Nakamura* who singled out Sasser for his offensive comment. *See* Appellant's App. vol. 3 at 631 ("[Y]ou should be aware of a comment that was made by one of the starters.").[18] And based on her complaint, it doesn't appear that the other Golf Starters' actions were comparably serious. *Cf. McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Kendrick*, 220 F.3d at 1230) ("[S]imilarly situated [employees] must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant.").

---

F. App'x 320, 323 (10th Cir. July 16, 2003). But this isn't a different test; rather, it's a *limitation* on the "same supervisor" requirement.

[18] Presumably, had Nakamura submitted similar complaints about the other Golf Starters, Landgren would have added them to the "file for letters" that he kept for each employee. *See* Appellant's App. vol. 5 at 949:4–5. But Landgren simply responded to the targeted complaint that he received.

In addition, Sasser glosses over the context in which Landgren communicated the "Japanese names" incident to Terry. Rather than propagate the story at random, Landgren told Terry about the incident when he rehired Sasser to work at Wingpointe in 2006. It seems eminently sensible that a former employee's immediate supervisor would inform his own superiors about the employee's past misconduct upon rehiring the employee. But nothing suggests that Landgren had a similar reason to apprise Terry of the other two Golf Starters' misconduct, for example, in connection with their being promoted or rehired. Indeed, it isn't clear that they still worked for the City after Terry became Golf Director in 2006. Absent evidence of the Golf Starters' similar circumstances, it wasn't disparate for Landgren to inform Terry about only Sasser's misconduct. *See id.* (requiring comparable employees to be "similarly situated . . . in all relevant respects").

Sasser also contends that Landgren treated him and Jeremy Green—a white coworker but not an applicant for the position in 2011—differently when they violated work rules. He reasons that, although he and Green were separately accused of "discourteous interactions with the public" and of "playing or teaching on the clock," Appellant's Reply Br. at 17, Landgren penalized Sasser but "looked past" Green's actions, *see* Appellant's Open. Br. at 44. This comparison isn't entirely apposite.

Though Sasser is short on specifics, it appears that, while Green was a starter at Wingpointe in the 1990s, a customer complained he was "loud and abusive." *Id.* at 15. Landgren reportedly "adamantly defended Green" and accepted Green's version

23

of events. *Id.* By contrast, when Sasser—also a starter at Wingpointe in the 1990s—received a complaint about the "American names" incident, Landgren documented the incident in Sasser's secret file and ignored Sasser's explanation of events. *Id.* at 12. These facts suggest that Sasser and Green received differential treatment from the same supervisor for similar misconduct when they held the same position at the same golf course. But an inference of pretext doesn't necessarily follow. *Cf. Kendrick*, 220 F.3d at 1232 ("Not every difference in treatment . . . will establish a discriminatory intent."). In fact, despite Sasser's severe misconduct, Landgren specifically declined to discipline him because he feared retaliatory litigation. In other words, Landgren *refrained* from treating Sasser worse than Green.[19]

As for differential treatment for "playing or teaching on the clock," Sasser alleges that Landgren recorded in his file an instance in 1997 where Sasser "stayed on the clock while giving a golf lesson that he did not ring up." Appellant's Reply Br. at 17. Sasser alleges that Green, by contrast, "received discipline" for playing golf on the clock in 2003. *Id.* at 16. This comparison is self-defeating: Green was disciplined while Sasser escaped with a mere notation in his file, meaning *Sasser*

_____

[19] Sasser also argues that Landgren supported Green for a promotion to Head Professional in 2010 despite his abusive behavior but didn't support Sasser for the Assistant Professional position in 2011. Yet these situations meaningfully differ. Landgren supported Green for Head Professional after Green had continuously worked under him at Wingpointe from 1995 to 2007, including a seven-year stint as his Assistant Professional from 2001 to 2007. Sasser, by contrast, applied for an Assistant Professional position after working under Landgren off and on from 1993 to 2000 and from 2006 to 2009 in various positions not corresponding to Assistant Professional. In short, Green and Sasser applied for different positions at different times with different levels of experience under Landgren's supervision.

received more favorable treatment than his white coworker. The comparison is also inapposite, because Sasser and Green didn't hold similar jobs when they played or taught golf on the clock: Sasser was a Starter in 1997, but Green was an Assistant Professional in 2003. Moreover, when Green violated the rules in 2003, Sasser wasn't a City employee working under Landgren's supervision; rather, he was a maintenance worker at the private Fore Lakes Golf Course. In short, Sasser and Green weren't similarly situated.

At bottom, the evidence indicates that Landgren scrutinized Sasser more rigorously than white employees, but nothing suggests that he *treated* Sasser worse than similarly situated employees. For his argument to the contrary, Sasser relies on inapposite comparisons to dissimilarly situated employees and evidence indicating that he received *more favorable* treatment than his coworkers. No reasonable jury would construe such evidence as supporting an inference of discrimination.

**B.     Disparate Treatment Vis-à-vis Applicants for The Position**

Aside from evidence of disparate treatment from coworkers, a discriminatory purpose also may be inferred from evidence of "differential treatment at the interview stage." *Danville*, 292 F.3d at 1250. Sasser flags at least four instances of differential treatment in the interview process for the Assistant Professional position.

First, Sasser alleges that panelists ignored Miller's past misconduct but penalized Sasser for similar behavior. He cites deposition testimony that Landgren voted against interviewing him in part for his manner being a "little rough" and "a little hard" on people, while Brimley noted his "reputation [for] being a little abrupt."

25

Appellant's Reply Br. at 15. Meanwhile, although Landgren had heard that Miller had "authority issues" and Brimley believed that Miller had used an abrupt "tone" with customers, they chose to take these issues with a "grain of salt."[20] *Id.*

Though not dispositive, an emphasis on a job candidate's subjective traits such as "roughness" and "abruptness" tends to suggest discrimination. *Cf. Danville*, 292 F.3d at 1252 (finding discrimination "more likely" where a candidate was assessed as having subjective traits such as "abrasiveness" and "animosity"). The inference is stronger where evaluators emphasize a particular candidate's subjective traits while discounting another candidate's similar traits. But only Landgren could be faulted for such differential treatment. It was Landgren who panned Sasser for his "roughness" while taking Miller's misbehavior "with a grain of salt." Appellant's App. vol. 4 at 823:11–13. Brimley, however, simply stated in his deposition that he'd heard about Sasser's "reputation" for abruptness from the Japanese golfers whom Sasser had offended, but he disclaimed penalizing Sasser for having such a reputation and even indicated that he "like[s]" Sasser. *Id.* vol. 2 at 330:13–15, 333:3–334:2, 337:8–15.

Second, Sasser contends that, despite their avowed preference for candidates with pro-shop experience, the panelists ignored that he had years of such experience

---

[20] Though the City argues that the panelists' differential treatment of Sasser's and Miller's previous misconduct is immaterial because Sasser and Miller weren't similarly situated, *see* Appellees' Br. at 40 (emphasizing that Sasser and Miller had different work experience and different supervisors), that analysis is inapposite to whether they were subjected to disparate standards during the interview process, *see* Appellant's Reply Br. at 12 (arguing that a similarly situated test makes no sense in this context because "applicants for positions or promotions frequently work in different departments or even for different employers").

while privileging white candidates with less experience. This presupposes that the panelists independently knew about all the pro-shop experience that Sasser had omitted from his online application. They did not. True, Landgren knew firsthand the extent of Sasser's experience working in City pro shops because he had supervised Sasser at Wingpointe. And Terry recalled that Sasser had worked in pro shops at Wingpointe in the 1990s and at Coral Canyon "at some point." *Id.* at 314:19–315:2. But Brimley and Schmehl had, at most, only a vague awareness that Sasser had worked in pro shops.[21] Their preference for certain applicants' pro-shop experience couldn't have been disparate if they didn't know about Sasser's comparable experience.

But even for Landgren and Terry, evidence of disparate treatment concerning pro-shop experience is tenuous. Sasser compares himself to a single candidate: Adam Pettingill. Sasser emphasizes that each panelist ranked Pettingill among their top-five candidates despite his not having worked in a pro shop since 2007 (like Sasser). Yet Pettingill's and Sasser's pre-2007 experience differed. While Sasser claims that he had worked in a capacity "equivalent to" an Assistant Professional (the job for which the panel was hiring) as Coral Canyon's Tournament Director from 2000 to 2002, *see*

---

[21] In their respective depositions, Brimley and Schmehl recalled only Sasser's experience teaching and playing golf and performing maintenance at various courses. Though Brimley faulted Sasser for lacking knowledge of software programs used in pro shops—suggesting some familiarity with Sasser's experience in the pro shop—he seemed to base that assessment on the absence of any pertinent experience in Sasser's application and not on firsthand knowledge. Schmehl, for his part, claimed a general awareness of Sasser's "history" and suitability for the position, but didn't expressly mention Sasser's pro-shop experience. *See* Appellant's App. vol. 2 at 296:8–13.

Appellant's Open. Br. at 7, Pettingill had served as an Assistant Professional at four different courses between 2002 and 2007. The panelists thus had race-neutral reasons to prefer Pettingill's experience.

In addition, only Landgren knew that Sasser had worked in a pro shop as recently as 2007. Insofar as he faulted Sasser for lacking recent pro-shop experience but preferred Pettingill for having it, Landgren applied inconsistent criteria.[22] Terry, however, mistakenly believed that Sasser hadn't worked in a pro shop for at least "eight, nine years" before applying for the position in 2011. Appellant's App. vol. 2 at 314:19–315:2. His preference for Pettingill's (and other candidates') more recent pro-shop experience, then, wasn't inconsistent. *See id.* at 313:16–19 (stressing that "all these other candidates are working a lot of hours on a weekly basis in the pro shop").[23] Nor was it dispositive. Even with that preference, Terry ranked Sasser tenth, meaning he thought that Sasser's experience may warrant an interview, provided other panelists ranked Sasser among their top ten candidates.[24]

---

[22] We entertain this argument, though Sasser doesn't appear to suggest that Landgren ranked the applicants on recent pro-shop experience.

[23] Arguably, even if Terry had known about Sasser's pro-shop work in 2007, it still would not have been disparate for him to prefer the recency of Pettingill's pro-shop experience. In 2007, Sasser was working as a Golf Starter, while Pettingill was working as an Assistant Professional. Pettingill thus had more *substantive* recent experience than Sasser.

[24] True, Terry ranked Sasser last, but a tenth-place ranking is materially different from no ranking. Ranking tenth on one panelist's list gives a candidate a chance at an interview if the candidate ranks sufficiently high on other panelist's lists. But an unranked candidate has no such opportunity.

28

Third, and similarly, Sasser faults the panel for considering only the written qualifications in his online application—maintenance work and teaching golf—while crediting Miller with undocumented experience as a temporary Assistant Professional at Nibley. True, Miller's online application omitted his Nibley experience; in fact, it included no work history at all. But all four panelists knew of Miller's experience because, after Terry alerted Miller that he failed to upload a resume with his online application, Miller submitted a hard copy for the panel's consideration.[25]

Regardless, Terry instructed the panelists to rank candidates based not only on the written application materials but also on what they knew about the candidates' "work experience beyond what might just show up on paper." *Id.* at 311:22–25. And three panelists—Terry, Landgren, and Brimley—independently knew about Miller's experience subbing as Nibley's Assistant Professional. The same isn't true for Sasser's unwritten experience. As noted above, Landgren knew the full extent of Sasser's City experience, and his failure to credit that experience might constitute disparate treatment. But Terry and Brimley knew far less, and, given their limited knowledge, did not act inconsistently by ranking Sasser lower than Miller. At a minimum, they knew that Miller had more recent pro-shop experience than Sasser, a central qualification in both panelists' evaluations.

---

[25] Sasser suggests that the panelists did not review Miller's resume. *See* Appellant's Open. Br. at 46 (arguing that, while the panelist "claimed they received Miller's resume, it has not been produced"). But Sasser did not dispute this fact at the district court, and he cannot do so for the first time on appeal. *Compare* Appellant's App. vol. 1 at 83–84, ¶ 35, *with id.* at 114–15, ¶ 35.

The analysis is different for Schmehl, though the result is the same. Schmehl evidently understood his task in reviewing applications as being limited to the written materials.[26] *Id.* at 289:8–13 (recalling an instruction to rank candidates based only on "what was written, . . . not what we knew of them"). Schmehl therefore ranked Sasser outside his top-ten candidates, finding the maintenance and teaching jobs on Sasser's application irrelevant to the position. Sasser argues that Schmehl applied a different standard for Miller, ranking him first even though he provided no job information in his application. But Schmehl based his ranking on Miller's resume, which was added to Miller's application packet after Terry requested it from Miller. Thus, Schmehl was consistent in considering only written materials.[27]

---

[26] Sasser asserts that the apparent variation in Terry's directions to different panelists renders the evaluation system suspect. The only evidence of such variation is that Schmehl recalled Terry telling the panelists to consider only written materials, but no other panelist recalled that instruction, and Terry testified that he directed all the panelists to rely on both written materials and their own independent knowledge. Miscommunication, not discrimination, likely accounts for the variation. A contrary inference is illogical. Sasser suggests that Terry forbade Schmehl from relying on any independent knowledge because he knew that Schmehl would vote to interview Sasser based on what he knew. Yet Terry himself ranked Sasser in his top ten, so the suggestion that Terry sought to prevent other panelists from voting for Sasser is problematic.

[27] Sasser argues that, because Miller's resume is not in the record, Schmehl must have relied on Miller's unwritten experience. *See* Appellant's Open. Br. at 24 ("[T]here is no resume from [Miller] to justify Schmehl's first place ranking of Miller."). Sasser wrongly equates the litigation record with the materials available to the hiring panel, which included Miller's resume. Moreover, the suggestion that Schmehl applied different standards to Sasser and Miller is illogical. Schmehl evidently took seriously his (perceived) obligation to review only written materials, testifying that, if not for that obligation, he would have ranked Sasser as a top-ten candidate. Arguably, if Schmehl was willing to make an exception and consider Miller's unwritten qualifications, he would have done the same for Sasser.

Fourth, and finally, Sasser argues that certain panelists discounted his PGA certification while preferring white candidates with the same credential. Specifically, Landgren ranked three white candidates at the top of his list because "they were PGA members," *see* Appellant's Reply Br. at 14, while Terry touted Miller's "continual progress towards PGA membership" as a primary reason for his hire, *id.* at 15. This is misleading. Though Landgren—and only Landgren—emphasized certain candidates' PGA membership in his initial ranking, Terry directed him to reconsider the ranking because PGA membership is just one of numerous relevant factors. Landgren heeded Terry's direction, ranking fewer PGA members (Pettingill (first) and Davis (eighth)) in his revamped top-ten list. Later, *after* the panel selected Miller for the position, Terry sent an e-mail in which he stated, among other things, that Miller had "made continual progress towards PGA membership." Appellant's App. vol. 2 at 342. But Terry didn't state that the panel chose Miller because of this progress.

In fact, it doesn't appear that PGA membership was a determinative factor for any candidate. Of the 28 applicants for the position, six were Class A PGA members: Davis, Scott Ballif, Lynn Mulhall, Pettingill, Sasser, and Thomas Snyder. Of those six, two made all four panelists' top-ten lists (Davis and Pettingill), one made one panelist's list (Sasser), and three were left unranked (Ballif, Mulhall, and Snyder). Setting aside Terry's list, the panelists omitted from their rankings *the majority* of applicants with PGA memberships. Meanwhile, all panelists ranked at least three candidates with no PGA experience at any level: Chris Gresh, Stone, and Samuel Szykula. And, after the interview process, Stone was named the runner-up for the

position. If the panelists deemed PGA experience a key qualification, then they wouldn't have ranked these applicants ahead of actual PGA members.[28]

In sum, all the evidence of disparate treatment at the interview stage concerns Landgren. He penalized Sasser for "roughness" but disregarded Miller's reputation for having "authority issues." He seemingly credited certain candidates for pro-shop experience but discounted Sasser's experience at Wingpointe's pro shop. And he appeared to credit Miller for unwritten experience serving as a temporary Assistant Professional but ignored Sasser's undocumented qualifications. This evidence tends to support an inference of pretext as to Landgren's decision against interviewing Sasser for the position.

## III. Evidence of "Subjective Standards" and "Procedural Irregularities"

In a similar vein as his disparate-treatment arguments, Sasser argues that panelists used subjective evaluation criteria "as a means for unlawful discrimination" against him. Appellant's Open. Br. at 50. Sasser further contends that "procedural irregularities" in the hiring process "directly and uniquely disadvantaged" him. *Id.* at 54. This section addresses these arguments in turn.

---

[28] True, the Position's "minimum qualifications" include some level of PGA experience. Appellant's App. vol. 3 at 607. But a closer examination of the applicant pool and the panelists' top-ten lists reveals that the panelists didn't place a premium on that requirement—for any applicant. And, while it may have been imprudent for the panelists to discount the requirement, that doesn't necessarily create a Title VII issue. *Cf. Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 606 (10th Cir. May 28, 2014) (rejecting the argument that "an employer's departure from the stated criteria in a job announcement should invariably create an inference of pretext").

## A. Panelists' Use of Subjective Criteria

Sasser argues that the hiring panel's use of subjective criteria to evaluate applicants for the position renders the process suspect. He asserts that, though Terry directed the panelists to individually review application materials and rank their top-ten candidates, Terry "provided no direction" on how to perform that ranking aside from assessing how applicants matched the job description. Appellant's Open. Br. at 50. Sasser stresses that Terry didn't "specify which criteria were important" or direct panelists to "explain *why* they chose certain applicants over others." *Id.* Thus, lacking any direction, panelists simply used their own subjective understanding of what the position required.

An employer's use of subjective evaluation methods can evince pretext, especially where "there is a showing of significant disparity in the representation of a particular group." *Bauer v. Bailar*, 647 F.2d 1037, 1045 (10th Cir. 1981). Even still, the "existence of subjective criteria alone is not considered evidence of pretext . . . ." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007). Indeed, "*some* subjectivity is to be expected in every hiring decision" because employers must have discretion to choose between qualified candidates. *Conroy v. Vilsack*, 707 F.3d 1163, 1177 (10th Cir. 1998). As a result, we "typically" will infer pretext from subjective criteria "only when the criteria on which the employers ultimately rely are *entirely* subjective in nature" and when the hiring process is especially opaque. *Id.* at 1178 (citation omitted).

The parties argue at length over whether the use of subjective criteria in this case resembles the facts in *Garrett*, *supra*, or the facts in our more recent decision in *Conroy*. In *Garrett*, a black employee received increasingly negative performance reviews and rankings soon after he formed a pro-diversity group at work. Managers were given no guidance on how to rank employees, but instead were told simply to rank them from best to worst. We deemed this evaluation method suspect because it was "wholly subjective" with "no set of objective criteria by which employees [we]re differentiated." *Garrett*, 305 F.3d at 1218. A jury could reasonably conclude that a supervisor's *opinion* was the sole basis on which an employee's rank was determined, making the process vulnerable to discrimination.

In *Conroy*, a five-person panel used five criteria to evaluate and recommend candidates for a position with the Forest Service. The panel chose a male candidate, and a female candidate sued, alleging that the panelists were given no guidance on how to rank candidates, leaving them to subjectively emphasize certain factors over others. We rejected this argument, reasoning that, unlike in *Garrett*, candidates' qualifications were assessed against five criteria which "were made known to the candidates, and the candidates submitted narratives explaining why their skills and experience matched up with each [criterion]." *Conroy*, 707 F.3d at 1178. The system therefore was "transparent" and consistent in that all candidates were "evaluated according to the same criteria." *Id.* (citation omitted). Further, we found it irrelevant that some panelists attached different weight to different criteria, reasoning that the presence of multiple panelists evaluating such criteria effectively checked against

abuse. *Id.* (noting that "we expect" subjective factors to invite disagreement) (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619 (6th Cir. 2003)).

The evaluation system in this case more closely resembles the system in *Conroy* than the one *Garrett*. Panelists evaluated candidates' qualifications against a published job description which specified not only the job's responsibilities but also its minimum qualifications. Though candidates weren't asked to explain how they matched the job description, the description itself was public, allowing candidates to tailor their applications accordingly. Further, all candidates were evaluated against the same job description, and while panelists may have attached different weight to each criterion, the presence of several panelists ensured that any one panelist's subjective evaluation didn't dictate the outcome.

Sasser attempts to distinguish *Conroy*, asserting that the panelists in that case evaluated applicants against just five criteria, whereas the job description in this case effectively listed 26 criteria. Yet the number of criteria doesn't alone render the evaluation system suspect. Quite the opposite: it crystalizes the extent of relevant considerations, thereby *reigning in* the evaluators' discretion to impose their own subjective understanding of what the position entails.

Sasser counters that, as in *Garrett*, panelists were directed to rank candidates "from best to worst," with no guidance as to which criteria were most important. *See* Appellant's Reply Br. at 23. But it is the *existence* of criteria that distinguishes this case from *Garrett*, where evaluators ranked employees based on opinion alone. Here, as in *Conroy*, each panelist ranked candidates against benchmark criteria listed in the

35

job description. Though panelists weren't instructed to emphasize certain criteria, the process was still tethered to and limited by those criteria. The process, then, wasn't "wholly subjective," because panelists couldn't simply invent their own indicia of competence. *See Garrett*, 305 F.3d at 1218.

Sasser further argues that, under our decision in *Bauer*, subjective criteria are suspect unless articulated "with reasonable specificity." Appellant's Reply Br. at 24 (quoting *Bauer*, 647 F.2d at 1046). Sasser repeats this "reasonable specificity" phrase several times, even though we didn't announce such a standard in *Bauer*—we simply stated that the evaluation system in that case *was* reasonably specific. In any event, Sasser doesn't explain why the criteria in this case fail that standard, other than that Terry allegedly "gave no guidance . . . as to what criteria should be used to evaluate the applicants." *Id.* at 25. But Terry's guidance as to evaluative priority is a different issue than criterial specificity. No reasonable juror would read the job description as being so vague as to be suspect.

Sasser nevertheless insists that Terry exploited the criteria's supposed vagueness by focusing on "recent pro shop experience," even though such experience isn't listed as a "minimum qualification" in the job description. *Id.* But the panel's review wasn't expressly or impliedly limited to the job description's "minimum qualifications." Nor could it be, given that the minimum qualifications say nothing practical about the position itself. *See* Appellant's App. vol. 3 at 607 (listing as minimum qualifications things like "post-high-school study" and "possession of a valid driver's license"). Unsurprisingly, the panelists compared applicants to the

36

*entire* job description, which highlights "pro shop" work both in the "job summary" and in the list of "typical duties." *Id.* at 606.

Further, Terry's subjective emphasis on the *recency* of applicants' pro-shop experience doesn't suggest discrimination. The temporal proximity of job experience to an open position obviously bears on the relevance of that experience, especially where, as here, multiple applicants have similar experience. *See Conroy*, 707 F.3d at 1177 (recognizing the necessity of some subjectivity in choosing between qualified candidates). Terry viewed recent pro-shop experience as evidence that candidates were "trying to improve their skills in that environment, which is 90 plus percent of where the job spends it's [sic] time[.]" Appellant's App. vol. 2 at 313:16–20. We see no reason to question this race-neutral assessment. *See Conroy*, 707 F.3d at 1178 ("[O]ur role is not to act as a super personnel department that second guesses employers' business judgments.") (citation and internal quotation marks omitted).

Given that Sasser was the sole African American working for the City's Golf Division in 2011, we are wary of the panel's use of subjective evaluation methods. *See Bauer*, 647 F.2d at 1045. But the published job description, against which the panelists evaluated applications for the Assistant Professional Position, sufficiently delimited panelists' discretion such that it foreclosed "an opportunity for unlawful discrimination." *See id* at 1046. A reasonable jury therefore couldn't draw an inference of pretext from the panel's use of subjective criteria.

## B. Evidence of Procedural Irregularities in the Hiring Process

Sasser notes that, during the hiring process, a "computer glitch" prevented five applicants' resumes—including his own—from uploading. Appellant's Open. Br. at 53. Other than himself, two of the five applicants were City employees: Miller and Davis. Terry contacted these two employees (both white) and asked them to resubmit their resumes. Yet Terry didn't contact Sasser, which Sasser speculates is because Terry had already decided against considering him for the position.

Some factual context is useful at the outset. Though circumstances beyond Sasser's control prevented his resume from uploading, he had every opportunity to apprise the panel of his relevant experience. As is common practice in the age of online hiring, applicants in this case were prompted to both upload a resume and manually input their employment history. The process is duplicative, but it ensures that an applicant's data is transmitted when, as here, the resume fails to upload or is in an incompatible format. Sasser, it seems, began entering his job history, listing two positions, but then decided to rely on his resume to provide the remaining experience. Yet even after submitting his incomplete application, Sasser could have logged back in and added the missing information. *See* Appellant's App. vol. 3 at 546 (e-mail providing an access code "to modify your application"). He did not, even though he knew the application was incomplete.

More striking, perhaps, is that Sasser's *resume* omitted much of his relevant experience. Not once does the resume mention any "pro shop" experience, though Sasser stakes much of this litigation on his having it. *See id.* vol. 2 at 353. Without

38

mentioning such experience, it is difficult to see how the presentment of Sasser's resume to the panel would have improved his candidacy. In fact, the resume may have *hurt* Sasser's chances because it misrepresents his experience. For example, it misstates that he served as Wingpointe's "Assistant Professional" in the 1990s and not as a seasonal Golf Starter as he now represents. *Compare* Appellant's App. vol. 2 at 353, *with* Appellant's Open. Br. at 9–10.

In any case, Sasser's "procedural irregularity" argument fails to support an inference of pretext. A procedural irregularity evinces pretext only if it "directly and uniquely disadvantaged a minority employee." *Johnson*, 594 F.3d at 1213 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995)). In this case, the "computer glitch" directly disadvantaged Sasser, but it didn't *uniquely* disadvantage him as a minority. By his own account, the glitch also affected four white applicants, two of whom Terry didn't contact.[29] Critically, Terry knew the other two applicants' white ethnicity because it was essentially the only information that their online applications disclosed. As a result, he knowingly failed to request resumes from Sasser and two white candidates.

Sasser glosses over this fact, emphasizing that Terry contacted only white applicants who were *City* employees but not the one black City employee. This is a distinction without a material difference. An individual's public/private employment status is irrelevant to whether the individual is uniquely disadvantaged as a *minority*

---

[29] Unfortunately, the record contains almost no relevant information regarding these candidates' backgrounds.

job applicant. *See Johnson*, 594 F.3d at 1213. Sasser cites no authority drawing such a distinction.[30]

Sasser counters that, as a City employee, he was more competitive for the position, so the impact on his chances was more acute. An applicant's employment with the City, however, was "at the very bottom of any factors that were considered" for the position. Appellant's App. vol. 5 at 892:19–20. Regardless, even assuming an advantage for City employees, that would establish, at most, that Sasser was uniquely disadvantaged as a *City employee* vis-à-vis the two non-City applicants—not as a minority. And Sasser suffered no such disadvantage in this case because his status as a City employee was clear from his online application, which included his job at Wingpointe from 2006 onward. Simply put, the inclusion of Sasser's resume wouldn't have revealed that he was a City employee.

Absent evidence that Sasser suffered uniquely as a minority applicant, we see no reason to question Terry's legitimate, nondiscriminatory rationale for contacting only Miller and Davis. Terry explained that he knew that Miller and Davis were both working in pro shops at the time, which made them ideal candidates for the position. Sasser, though, wasn't working in a pro shop, and Terry was unfamiliar with the

---

[30] In effect, Sasser argues that Terry's actions disadvantaged him vis-à-vis *similarly situated* applicants. Elsewhere, though, Sasser concedes that a similarly situated test doesn't make sense in the failure-to-interview (or promote) context, beacuse job applicants "frequently work . . . for different employers." Appellant's Reply Br. at 12. In this case, the applicants worked for various public and private employers. The pretext inquiry must account for all those applicants, not only a subset of "City" employees.

40

other two applicants' work experience. It may be that Terry preselected Miller and Davis as ideal candidates for the position based on what he perceived as their superior qualifications, but preselection alone "does not support the inference that the [defendant's] employment decision was motivated by [race]-based discrimination." *See Jaramillo*, 427 F.3d at 1314.

It is noteworthy, moreover, that Terry selected Sasser for an interview when he applied for the same type of Assistant Professional position in 2007. At the time, Sasser *was* working as a Golf Starter in the pro shop at Wingpointe, meaning his experience matched Terry's criteria for the position. That Terry selected Sasser to interview for an Assistant Professional position in 2007 when he had recent pro-shop experience suggests the sincerity of Terry's preference for applicants with such experience in 2011.

At bottom, we are troubled by Terry's failure to contact all the applicants whose resumes failed to upload, but Terry's imprudence doesn't evince an intent to discriminate against Sasser. That the procedural irregularity equally disadvantaged Sasser and two white candidates ends the inquiry.

## IV.    Evidence of Sasser's Superior Qualifications

Sasser's closing argument is that the City's proffered reasons for denying him an interview are pretextual because he is "more qualified" than Miller, the winning candidate. *See* Appellant's Open. Br. at 54. To support this argument, Sasser presents a five-page chart comparing his and Miller's qualifications against the requirements in the published job description for the position. He insists that this results in the

inescapable conclusion that he had "superior qualifications to Miller." Appellant's Reply Br. at. 26–27.

To demonstrate pretext on the theory that a minority applicant had superior qualifications to the prevailing candidate, "a plaintiff must come forward with facts showing an overwhelming disparity in qualifications." *See Johnson*, 594 F.3d at 1211 (quoting *Jaramillo*, 427 F.3d at 1309) (internal quotation marks omitted). We will not draw an inference of discriminatory pretext "based upon minor differences between plaintiff's qualifications and those of successful applicants; rather, there must be an overwhelming merit disparity." *Conroy*, 707 F.3d at 1172 (citations omitted). And, importantly, we assess the competing candidates' qualifications "only in light of the facts available to the decisionmaker at the time of the decision, not in light of facts that might have been apparent to others or that might have become apparent only in hindsight." *Johnson*, 594 F.3d at 1211–12.

Here, Sasser's claim to qualitative superiority over Miller fails because most of his relevant experience wasn't known to the panel when he applied for the position in 2011. Sasser's online application listed only maintenance and golf-teaching work at Fore Lakes and Wingpointe from 2002 onward, but it omitted his experience as a Golf Starter at Wingpointe in the 1990s and in 2006, his experience as Tournament Director at Coral Canyon from 2000 to 2002, and his experience as a golf instructor at Nibley from 2008 to 2011. Sasser now touts his 18 years' experience in the golf industry against Miller's five—despite that he omitted much of that experience from his application. Indeed, he weighs his eight years' work in pro shops—none of which

42

he included in his application—against Miller's nine months filling in as Assistant Professional at Nibley. He emphasizes, in particular, that his two years as Coral Canyon's Tournament Director were "equivalent to" an Assistant Professional position. *See* Appellant's Open. Br. at 7.

Even assuming this experience demonstrates an overwhelming disparity in Sasser's and Miller's qualifications, that disparity was fully known only to Landgren. Terry, meanwhile, generally knew about Sasser's pro-shop experience and his work as Coral Canyon's Tournament Director. But he did not discount that experience; to the contrary, he *credited* it when he ranked Sasser as a top-ten candidate. We decline to infer invidious discrimination from a top-ten ranking (over 18 other candidates) simply because Terry ranked Miller higher on his list. Plainly, Terry considered both candidates worthy of consideration, even if he deemed Miller the stronger candidate. As for Brimley and Schmehl, they weren't aware of the full extent of Sasser's prior experience; faulting them for ignoring it is pure hindsight revisionism.

## V.     Summary

Sasser has adduced evidence supporting a reasonable inference of pretext, but it largely concerns a single panelist: Landgren. Starting in 1995, Landgren created a log of Sasser's missteps to preemptively insure against Sasser "pulling the race card." Though Landgren collected written complaints for all of his employees, he added notations to only Sasser's file. Later, during the 2011 hiring process for the Assistant Professional position, Landgren decided against interviewing Sasser based, in part, on the misconduct that he recorded when he singled out Sasser for scrutiny—even as

43

he ignored other applicants' past misconduct. Further, Landgren seemingly credited Miller for undocumented experience but ignored what he knew about Sasser's qualifications—which, Sasser submits, were superior to Miller's.

Aside from Landgren, there is some troubling evidence regarding Terry's conduct in connection with the 2011 interview process. His decision to contact two white applicants whose resumes failed to upload but not Sasser suggests willful blindness to Sasser's qualifications, but it doesn't support an inference of animus when considered in light of his failure to contact two other white applicants. In addition, Terry's decision to interview Sasser for the same type of position in 2007 and his top-ten ranking of Sasser for the position in 2011 both militate against an inference of pretext.

But even assuming Landgren and Terry's racial motivation, the four-member panel's decision not to interview Sasser wasn't pretextual. In their initial rankings, the panelists unanimously agreed on interviewing nine candidates, while three voted to interview a tenth candidate. Despite those rankings, the tenth candidate didn't receive an interview. So, Sasser likely needed to rank on all four panelists' top-ten lists to receive an interview. That one panelist (Landgren) left Sasser unranked and another (Terry) ranked Sasser tenth didn't affect Sasser's interview chances because the other two panelists (Brimley and Schmehl) didn't vote to interview him. And Sasser adduces no evidence that, but-for Landgren and Terry's votes, he would have received an interview. *See Burns*, 330 F.3d at 1285.

We hold that Sasser has failed to raise a genuine issue of material fact that the City's decision against interviewing him, and thus promoting him, was pretextual.

## CONCLUSION

For the above reasons, we affirm the district court.

Entered for the Court


Gregory A. Phillips
Circuit Judge